**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| **CXT SYSTEMS, INC.,** | § | |
| | § | |
| | § | **Case No. 2:18-cv-00171-RWS-RSP** |
| **Plaintiff,** | § | **(LEAD CASE)** |
| | § | |
| **v.** | § | <u>**JURY TRIAL DEMANDED**</u> |
| | § | |
| **ACADEMY, LTD., d/b/a ACADEMY** | § | |
| **SPORTS + OUTDOORS,** | § | |
| **PIER 1 IMPORTS, INC.,** | § | **Case No. 2:18-cv-00172-RWS-RSP** |
| **THE CONTAINER STORE GROUP, INC.,** | § | **Case No. 2:18-cv-00173-RWS-RSP** |
| **CONN'S, INC.,** | § | **Case No. 2:18-cv-00231-RWS-RSP** |
| **FOSSIL GROUP, INC.,** | § | **Case No. 2:18-cv-00232-RWS-RSP** |
| **J. C. PENNEY COMPANY, INC.,** | § | **Case No. 2:18-cv-00233-RWS-RSP** |
| **STAGE STORES, INC.,** | § | **Case No. 2:18-cv-00234-RWS-RSP** |
| **TAILORED BRANDS, INC.,** | § | **Case No. 2:18-cv-00235-RWS-RSP** |
| | § | |
| **Defendants.** | § | **(CONSOLIDATED CASES)** |
| | § | |

**PLAINTIFF CXT SYSTEMS, INC.'S
<u>OPENING CLAIM CONSTRUCTION BRIEF</u>**

## <u>TABLE OF CONTENTS</u>

**Page(s)**

I.  CLAIM CONSTRUCTION STANDARD OF REVIEW ..................................................1

    A.   GOVERNING LAW .........................................................................................1

    B.   PATENT BACKGROUND AND TECHNOLOGY ...............................................1

    C.   LEVEL OF ORDINARY SKILL IN THE ART ..................................................2

II.  RECENTLY UNOPPOSED CONSTRUCTIONS ...........................................................2

III.  DISPUTED TERMS...................................................................................................3

    A.   "temporary portion" / "client-side application having at least a temporary
         portion" (Claims 1, 11, 19, and 27 of the '806 Patent; Claims 4, 25, and 50
         of the '581 Patent; and Claim 7 of the '875 Patent) (No. 1) ..................................3

    B.   "processing module [for processing]" (Claims 36 and 38 of the '581
         Patent and Claims 8 and 18 of the '806 Patent ) (No. 12)......................................4

    C.   "application configured to manage a request/response process" (Claims 1,
         11, 19, and 27 of the '806 Patent) (No. 13)...........................................................5

    D.   "server-side application for interacting with the central repository" (Claim
         6 of the '806 Patent) (No. 19)..............................................................................8

    E.   "server-side application for interacting with a database management
         system" (Claims 16 and 24 of the '806 Patent and Claims 13-16, 18-19,
         31-32, 34-36, 39-41, 45-47, 68-71, and 73-74 of the '581 Patent) (No. 20)..........9

    F.   "in response to authenticating the consumer, invoking a single sign-on
         mechanism so that the consumer will not be required to resubmit the
         consumer authentication information upon accessing a subsequent web
         page file prior to expiration of a timeout period" / "single sign-on
         [mechanism / feature / function]" (Claims 2, 43 of the '581 Patent and
         Claims 7, 13-16, 20-21, 36-38, 44 of the '875 Patent ) (No. 27)..........................10

    G.   "automatically managing subsequent authentications of the consumer with
         the database management system so that the consumer will not be required
         to again input the consumer authentication information" (Claims 1-2, 13,
         15-18, 20-22, 27-28, 36-38 of the '875 Patent) (No. 29).....................................12

    H.   "retrieving the selected consumer information elements. . . by filtering
         data from the information account with the database management system"
         / "retrieving one or more consumer information element from the
         information account by filtering data from the information account"

(Claims 1, 24, 36, 50, 58, 78, 82,84-85, 88 of the '581 Patent and Claim 1
of the '875 Patent) (No. 31)....................................................................................13

I.     "database management system" (Claims 1, 6, 13, 16, 24, 31-32, 36, 50, 58,
       78-79, 82, 84-85, 88 of the '581 Patent, Claims 1, 8, 27 of the '875 Patent,
       and Claims 16, 24 of the '806 Patent) (No. 33)....................................................15

J.     "name field / geographic address field" (Claims 1, 17, 19, 27 of the '875
       Patent) (No. 42) / "information account / personal information account"
       (Claims 1, 9-10, 18-19, 21, 23-24, 29-30, 34-36, 39, 50, 55, 58-59, 64-65,
       73-74, 76-79, 82-85, 87-88 of the '581 Patent) (No. 43) / "information
       element" (Claims 1-5, 7-15, 17-23, 25-27 of the '806 Patent and Claims 1,
       2, 4, 7-12, 14-20, 22, 24-25, 27-30, 32-36, 38, 39, 41, 45-55, 57-60, 62-67,
       69-79, 82-88) (No. 110) / "authentication information" (Claims 1-2, 4, 24,
       41, 43, 45, 51-52, 59, 79, 83, 87 of the '581 Patent) (No. 111) ........................18

K.     "web-site" / "website" / "web site" (All Claims of the '875 Patent and
       Claims 84, 87-88 of the '581 Patent) (No. 44) / "subsequent website"
       (Claims 1, 17, 27 of the '875 Patent) (No. 75) ...................................................21

L.     "host servers" (Claim 17 of the '875 Patent) (No. 57)........................................24

M.     "selected consumer information elements" (Claims 1, 24, 36, 50 of the
       '581 Patent) (No. 87) ..........................................................................................25

N.     "the system of claim 58, wherein the host server further executes
       computer-executable instructions for: in response to transmitting the
       selected consumer information elements to the network device, receiving
       an acknowledgment from the network device indicating that the selected
       consumer information elements were used to complete a transaction, the
       acknowledgment including transaction information; and storing the
       transaction information in a transaction log associated with the
       information account in the central data repository" (Claim 77 of the '581
       Patent) (No. 121)..................................................................................................27

O.     "information account comprising a plurality of consumer information
       elements associated with a consumer and being subject to the consumer's
       control and management" / "information account comprising a plurality of
       consumer information elements associated with a consumer and being
       subject to the consumer's control and management" (Claims 1, 24, 58, 88
       of the '581 Patent and Claims 1, 11, 19 of the '806 Patent) (No. 126)................28

P.     "prior to transmitting the request from the network device for the
       determined one or more consumer information elements, receive and
       execute at the network device the client-side application configured to
       manage the request/response process for the network device" (Claim 19 of
       the '806 Patent) (No. 130)....................................................................................29

Q.      Disputed Ordering of Steps in Method Claims (Dkt. No. 158)............................30

IV.    CONCLUSION ...............................................................................................................32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AGIS Software Dev., LLC v. Huawei Device USA Inc.*,
   No. 2:17-CV-513-JRG, 2018 WL 4908169 (E.D. Tex., Oct. 10, 2018) ..................................1

*AstraZeneca LP v. Apotex, Inc.*,
   633 F.3d 1042 (Fed. Cir. 2010).......................................................................................19

*In re DiStefano*,
   808 F.3d 845 (Fed. Cir. 2015).................................................................................. 19, 20

*Gemalto S.A. v. HTC Corp.*,
   No. 6:10-CV-561, 2012 WL 2505745 (E.D. Tex., June 28, 2012)........................................6

*In re Gulack*,
   703 F.2d 1381 (Fed. Cir. 1983)........................................................................................19

*Interactive Gift Exp., Inc. v. Compuserve Inc.*,
   256 F.3d 1323 (Fed. Cir. 2001)........................................................................................32

*King Pharm., Inc. v. Eon Labs, Inc.*,
   616 F.3d 1267 (Fed. Cir. 2010)........................................................................................19

*In re Lowry*,
   32 F.3d 1579 (Fed. Cir. 1994).................................................................................. 19, 20

*Microprocessor Enhancement Corp. v. Texas Instruments Inc.*,
   520 F.3d 1367 (Fed. Cir. 2008)........................................................................................30

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
   134 S. Ct. 2120 (2014) ....................................................................................................4

*In re Ngai*,
   367 F.3d 1336 (Fed. Cir. 2004)........................................................................................19

*Oyster Optics, LLC v. Coriant Am. Inc.*,
   No. 2:16-CV-1302-JRG, 2017 WL 6026729 (E.D. Tex., Dec. 5, 2017),
   opinion clarified, No. 2:16-CV-1302-JRG, 2018 WL 3067727 (E.D. Tex.,
   June 21, 2018)...............................................................................................................30

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) .................................................................. 6, 11

*Phillips v. AWH Corp.*,
   415 F.3d 1310 ...........................................................................................................8, 9

*Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*,
   844 F.3d 1370 (Fed. Cir. 2017)........................................................................... 4, 24, 27, 29

*Superguide Corp. v. DirecTV Enters., Inc.*,
   358 F.3d 870 (Fed. Cir. 2004).....................................................................................*passim*

*TALtech Ltd. v. Esquel Apparel, Inc.*,
   279 Fed. App'x. 974 (Fed. Cir. 2008) ................................................................................32

*Watts v. XL Systems, Inc.*,
   232 F.3d 877 (Fed. Cir. 2000)..............................................................................................6

*Williamson v. Citrix Online, LLC*,
   792 F.3d 1339, 115 USPQ2d 1105 (Fed. Cir. 2015) (en banc) ...........................................6

**Statutes**

35 U.S.C. 112...................................................................................................................5, 6

35 U.S.C. 112(f)....................................................................................................................5

Pursuant to P.R. 4-5(a) and the Court's First Amended Docket Control Order of May 9, 2019 (Dkt. 156), Plaintiff CXT Systems, Inc. ("CXT") hereby submits its Opening Claim Construction Brief.  The asserted patents are U.S. Patent Nos. 7,016,875 (the "'875 Patent," Ex. A), 7,257,581, (the "'581 Patent," Ex. B), and, 8,260,806 , (the "'806 Patent," Ex. C), (together, the "Asserted Patents").

## I.     CLAIM CONSTRUCTION STANDARD OF REVIEW

### A.     GOVERNING LAW

The governing legal standards relating to claim construction are described in the Court's opinion in *AGIS Software Dev., LLC v. Huawei Device USA Inc.*, No. 2:17-CV-513-JRG, 2018 WL 4908169, at *3-5 (E.D. Tex., Oct. 10, 2018) and are hereby incorporated by reference.

### B.     PATENT BACKGROUND AND TECHNOLOGY

The '875 Patent issued on March 21, 2006 from Application No. 09/974,766 filed on October 9, 2001, a continuation-in part of Application No. 09/933,567, filed on August 20, 2001, and a continuation-in-part of Application No. 09/923,285, filed on August 6, 2001. The '581 Patent issued on August 14, 2007 from Application No. 09/923,285 (the "'285 Application") filed on August 6, 2001.  The '806 Patent issued on September 4, 2012 from Application No. 11/824,358 (the "'358 Application") filed on June 29, 2007, a continuation of the '285 Application, filed on August 6, 2001, now issued as the '581 Patent.  The Asserted Patents are directed to systems and methods for storing, managing, and distributing consumer information using an information account stored in a central data repository.  In response to a request from a consumer through a client side device or vendor server, a host server filters selected consumer information elements from the information account and transmits the consumer information elements for automatic population into corresponding fields.

## C.    LEVEL OF ORDINARY SKILL IN THE ART

The "Field of the Invention" is described generally as related to the field of storage, management and distribution of consumer information.  A person of ordinary skill in the art ("POSITA") would have a bachelor's degree in computer science, or equivalent, with one to two years of experience in the designing e-Commerce websites.  Ex. D, Declaration of Rahul Vijh Regarding Proposed Constructions and Definiteness of the Asserted Claims of U.S. Patent Nos. 7,016,875, 7,257,581, and 8,260,806, ¶29.  Extensive experience and technical training may substitute for educational requirements, while advanced education, such as a relevant MS or PhD, might substitute for experience.  *Id*.  As the Asserted Patents issued from applications that claimed priority to applications filed in the August to November 2000 period, that is the relevant time period from which a person of ordinary skill in the art would evaluate the disclosure of the Asserted Patents.  *Id*.

## II.    RECENTLY UNOPPOSED CONSTRUCTIONS

Following the submission of the parties' P.R. 4.3(a) Joint Claim Construction and Prehearing Statement, Dkt. 157, and in order to narrow the disputes before this Court, CXT agreed with Defendants that the following terms should be construed as originally advocated by Defendants:

1.  "[auto-populating] " terms (all claims of the '875, '806 and '581 Patent s) **(No. 3)**[1]

2.  "authenticating the consumer based on the authentication information" (Claims 1, 24, 43, 83, and 87 of the '581 Patent) **(No. 25)**

3.  "consumer information elements that are changed by the consumer " (Claims 1 and 17 of the '806 Patent, all claims of the '875 Patent ) **(No. 108)**

---

[1] Claim numbers are based on those found in the Joint Claim Construction and Prehearing Statement, Dkt. 157.

Additionally, CXT reduced the number of asserted claims as to all Defendants and therefore the following claim terms are no longer disputed and this Court need not address them: **Nos. 21-24, 37, 38, 45, 46, 106, 112-120, and 123-125**.

The remaining claim terms in dispute are addressed below.

## III.     DISPUTED TERMS

### A.     **"temporary portion" / "client-side application having at least a temporary portion"** (Claims 1, 11, 19, and 27 of the '806 Patent; Claims 4, 25, and 50 of the '581 Patent; and Claim 7 of the '875 Patent) **(No. 1)**

| CXT's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a portion of an application that is specific to the browser session only and removed from the client device memory after its execution" | "a portion of an application that is specific to the browser session only and removed from the client device after its execution" |

The central dispute as to these terms is whether the "temporary portion" of an application is removed from a client device generally or more specifically from the client device memory after its execution.   CXT maintains that it is removed only from the client device memory. Defendants' proposed construction reads in an additional unnecessary limitation, and should therefore be rejected.

In contrast to Defendants' proposed construction, the specifications of the Asserted Patents are clear that the client application is downloaded and then stored in temporary memory storage:   "The client-side application 105 resides in temporary memory storage of the client device 104, such as cache memory or the like, and may be removed from the client device 104 after its execution is complete."   (Ex. C, 7:22-25; Ex. B, 7:35-38; Ex. A 7:55-58.)   However, temporary storage memory differs with permanent storage, such as a hard drive.  Ex. D, ¶ 90. Therefore, Defendants' proposed construction requires an additional limitation— removal from permanent storage— not even disclosed within the specifications.

Defendants do not assert disclaimer, disavowal of scope, or lexicography, nor do they provide any expert testimony to buttress their position.   Accordingly, there is no reason to introduce a limitation.   *See Superguide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004) ("a particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment").

Thus, as Defendants' proposed construction is unsupported, it should be rejected.

**B.**      **"processing module [for processing]"** (Claims 36 and 38 of the '581 Patent and Claims 8 and 18 of the '806 Patent[2] ) **(No. 12)**

| CXT's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary | Indefinite |

Defendants contend that the term "processing module [for processing]" is indefinite while Plaintiff maintains that it would be understood by a person of ordinary skill in the art such that no construction is necessary.   In order to prevail on this term, Defendants must show that the claims fail to "inform those skilled in the art about the scope of the invention with reasonable certainty."   *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017) (citing *Nautilus, Inc. v. Biosig Instruments, Inc.,* 134 S. Ct. 2120, 2129 (2014)).   Further, "[i]ndefiniteness must be proven by clear and convincing evidence."   *Id.*   As Defendants cannot meet this high burden, this Court should reject their invitation to invalidate the "processing module [for processing]" claims.

Based on the disclosure of the claims and the specifications, a POSITA would understand the scope of these terms.   For example, claims 8 and 18 of the '806 Patent recite "passing the one or more consumer information elements to a processing module executed by the vendor server" while claims 36 and 38 of the '581 Patent recite "passing the selected consumer information

---

[2] Plaintiff is no longer asserting claims 15, 17, 33, 36, 38, 72 of the '581 Patent or claim 26 of the '806 Patent.

elements to a processing module for processing."  Additionally, the specifications disclose: "The vendor server 114 may then process the consumer information, as needed, by way of a processing module" ('581 Patent at 9:18-20); "The . . . other program module executed by the host server 108 may be responsible for decrypting the search result." ('806 Patent at 8:29-31). Further, Mr. Vijh's Declaration confirms that based on such a disclosure, a POSITA would understand such a term with reasonable certainty to refer to code that is executed by a relevant processing entity.  Ex. D, ¶¶ 31-34.  In contrast, Defendants have failed to provide *any* expert testimony as to this term, yet even their expert admits that the term "module" is well understood within the art to mean "a collection of routines and data structures that performs a particular task . . . "  *See* Ex. E, .¶ 66.

Thus, as Defendants' indefiniteness position is unsupported, it should be rejected.

C.     **"application configured to manage a request/response process"** (Claims 1, 11, 19, and 27 of the '806 Patent) **(No. 13)**

| CXT's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and Ordinary<br><br>Alternatively to the extent this term is governed by § 112, ¶ 6<br><br>Function: managing a request/response process<br><br>Structure: Client device 104 implementing the algorithm of Figs. 5 and 6 including steps 510, 520, 544 , 616, 626, 634 and corresponding portions of specifications ('806 13:42-17:44; '581 13:42-17:44) | Indefinite.<br><br>Alternatively, a JAVA applet, as disclosed in specification. |

The parties' key dispute is whether this term invokes § 112(6).  CXT maintains that it does not, and even if it did, the claims recite sufficient structure to perform the relevant function.

A limitation that does not use the term "means" or "step" will trigger the rebuttable presumption that 35 U.S.C. 112(f) or pre-AIA 35 U.S.C. 112, sixth paragraph does not apply.

*See, e.g., Phillips v. AWH Corp.*, 415 F.3d 1303, 1310, (Fed. Cir. 2005) (*en banc*).   The presumption is overcome when "the claim term fails to 'recite sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'" *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348, 115 USPQ2d 1105, 1111 (Fed. Cir. 2015) (en banc) (quoting *Watts v. XL Systems, Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000); *cf. Gemalto S.A. v. HTC Corp.*, No. 6:10-CV-561, 2012 WL 2505745, at \*23 (E.D. Tex., June 28, 2012) (finding that "means for translating . . ." terms "recite[d] a structurally complete 'means for translating' because they recite a 'programmable environment' and include all the necessary algorithmic steps to perform the 'means for translating' function." ) (footnote omitted.)

A POSITA would understand that these claims denote sufficiently definite structure for performing the function and, therefore, do not invoke § 112, ¶ 6 and that the relevant function is "managing a request/response process."   Ex. D, ¶ 37.   The claims themselves then provide sufficiently definite structure for performing the function in the form of a two-step algorithm. For example, Claims 1, 11 and 19 of the '806 Patent comprise the following two steps: (1) transmitting over the distributed electronic network from the network device a request for the determined one or more consumer information elements, the request including consumer authentication information and being made by the network device responsive to an input command supplied by the consumer; and (2) receiving at the network device the one or more consumer information elements filtered from the information account.   Meanwhile, Claim 27 comprises two materially similar steps.

The above algorithm discloses sufficient structure to allow a POSITA to implement its steps in light of the disclosure in the specification.   *Id.*, ¶ 38.   Based on the disclosure in the specification, a POSITA would know how to transmit over the distributed electronic network

from the network device a request for the determined one or more consumer information elements, the request including consumer authentication information and being made by the network device responsive to an input command supplied by the consumer: "At step 510, the user authentication information is combined with vendor authentication information and is sent to the DBMS 109." ('806 Patent, 14:14-16.)  Similarly the disclosure would inform a POSITA as to how to receive at the network device the one or more consumer information elements filtered from the information account: "Then, at step 520, the resulting information elements are transmitted to the client-side application 105, for example in the form of an XML data stream." ('806 Patent, 14:46-49.)  More generally, a POSITA would also understand how to transmit information in a distributed electronic network.  *See, e.g.*, '806 Patent at 5:31-35 ("Generally, a network device includes a communication device for transmitting and receiving data and/or computer-executable instructions over the network 106. . ."); *Id.* at 7:55-56 (". . . transmitted over an open network using any appropriate protocol.")  CXT's expert's declaration is in accord. See Ex. D, ¶¶ 38- 39.

Even if this claim term were subject to § 112, ¶ 6, the specification comprises sufficient support for the structure corresponding to the function of "managing a request/response process." A POSITA would understand that the relevant structure is a client device implementing the disclosed algorithm of Figs. 5 and 6 including steps 510, 520, 544, 616, 626, 634 which correspond to the relevant request and responses. *(See, e.g.*, '806 13:42-17:44).  Notably, a POSITA would understand that the relevant structure would not be limited to a JAVA applet as Defendants have contended in their proposed alternative construction: "JAVA applets are well known client-side applications and are particularly suited for use in various embodiments due to their platform-independent nature. ***However, any other type of client-side application may be***

*used* without departing from the spirit and scope of the present invention." ('806, 7:17-22; emphasis added).   Further, CXT has provided unrebutted expert testimony establishing a POSITA's relevant understanding.   *See* Ex. D, ¶¶ 35-41.   Therefore, Defendants cannot meet their high burden to establish indefiniteness and this Court should reject their invitation to invalidate these claims.

>   **D.**   **"server-side application for interacting with the central repository**" (Claim 6
>         of the '806 Patent) **(No. 19)**

| CXT's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and Ordinary<br><br>Alternatively to the extent this term is governed by § 112, ¶ 6<br><br>Function: interacting with the central data repository<br><br>Structure: network server 108 implementing the algorithm of Figs. 5, 6 and 7 including steps 510, 520, 536, 544 and corresponding portion of the specifications. | Indefinite. |

The parties' key dispute is whether this term invokes § 112(6).   CXT maintains that it does not, and even if it did, the claims recite sufficient structure to perform the relevant function.

As with the immediately preceding term, this term lacks the "means for" language such that a rebuttable presumption exists that § 112, ¶ 6 is not invoked.   *Phillips v. AWH Corp.*, 415 F.3d 1310.   However, if the Court determines that this term is governed by § 112, ¶ 6, the relevant function would be "interacting with the central data repository" wherein interacting comprises communicating.   The corresponding structure would be network server 108 implementing the algorithm, as shown in Figs. 5, 6 and 7, including steps 510, 520, 536, 544, 626, 634 and corresponding portion of the specifications as each of these steps comprise communications between the network server and the central data repository.   It is undisputed that

a POSITA would understand how to transmit information in a distributed electronic network. *See, e.g.*, Ex. D., ¶ 46 (citing '806 Patent at 5:31-35; 7:55-56). Additionally, CXT's unrebutted expert testimony establishes that the specification discloses the steps involved in this communication so that a POSITA would be informed of their scope. *Id.*, ¶¶ 44-46. Therefore, Defendants cannot meet their high burden to establish indefiniteness and this Court should reject their invitation to invalidate these claims.

**E.** **"server-side application for interacting with a database management system"**
(Claims 16 and 24 of the '806 Patent and Claims 13-16, 18-19, 31-32, 34-36, 39-41, 45-47, 68-71, and 73-74 of the '581 Patent) **(No. 20)**

| CXT's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and Ordinary | Indefinite. |
| Alternatively to the extent this term is governed by § 112, ¶ 6 | |
| Function: interacting with a database management system | |
| Structure: network server 108 implementing the algorithm Figs. 5, 6 and 7 including steps 510, 520, 536, 544, 626, 634 and corresponding portion of the specifications. | |

The parties' key dispute is whether this term invokes § 112(6). CXT maintains that it does not and, even if it did, the claims recite sufficient structure to perform the relevant function.

As with the immediately preceding terms, this term lacks the "means for" language such that a rebuttable presumption exists that § 112, ¶ 6 is not invoked. *Phillips v. AWH Corp.*, 415 F.3d 1310. However, if the Court determines that this term is governed by § 112, ¶ 6, the relevant function would be "interacting with a database management system ("DBMS")," wherein interacting comprises querying and receiving responses. The corresponding structure would be network server 108 implementing the algorithm, as shown in Figs. 5, 6 and 7, including

steps 510, 520, 536, 544, 626, 634 and corresponding portion of the specifications.  As CXT's

expert explains, the specifications fully inform a POSITA how to implement the relevant queries

between the server-side application and the DBMS and as to their scope with reasonable

certainty.  Ex. D, ¶¶ 51-54 (citing '806 Patent at 2:56-59; 7:56-8:29; 10:9-21; 15:45-50 and '581

Patent at 2:58-61; 8:7-24; 10:25-37; 14:3-7.)  In contrast, Defendants' expert is silent as to this

term.  Therefore, Defendants cannot meet their high burden to establish indefiniteness and this

Court should reject their invitation to invalidate these claims.

> **F.**  **"in response to authenticating the consumer, invoking a single sign-on mechanism so that the consumer will not be required to resubmit the consumer authentication information upon accessing a subsequent web page file prior to expiration of a timeout period" / "single sign-on [mechanism / feature / function]"** (Claims 2, 43 of the '581 Patent and Claims 7, 13-16, 20-21, 36-38, 44 of the '875 Patent ) **(No. 27)**

| CXT's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "single sign-on [mechanism / feature / function]" as:<br><br>"a mechanism that allows the consumer to provide authentication information to access his information account at only a first website, and then automatically reauthenticates the consumer at subsequent websites" | "single sign-on [mechanism / feature / function]" as:<br><br>"a mechanism that allows the consumer to provide authentication information to access his information account at only a first website, and then uses applet technology to automatically re-authenticate the consumer at subsequent websites" |

The parties agree that the "single sign-on [mechanism / feature / function]" is a

mechanism that allows the consumer to provide authentication information to access his

information account at only a first website, and then automatically reauthenticates the consumer

at subsequent websites.  The parties' key dispute as to this term is whether the term should be

limited to a preferred embodiment comprising "applet technology."  CXT maintains that it

should not as Defendants' attempt to limit the claims to an embodiment in the specification in the

absence of lexicography or disclaimer should be rejected and the term should be afforded its plain and ordinary meaning.

The specifications of the '875 and '581 Patents make clear that the "applet technology" represents only one of many embodiments of the single sign-on mechanism.  For example, the '875 Patent discloses that "Applets (e.g., JAVA applets) are particularly well-suited for use as client-side applications" ('875 Patent at 22:50-55), but that "any other type of client-side application may be used without departing from the spirit and scope of the present invention." *Id*. at 7:53-55.  The '581 Patent includes an identical disclosure, noting that "JAVA applets are well known client-side applications and are particularly suited for use in various embodiments due to their platform-independent nature.  However, any other type of client-side application may be used without departing from the spirit and scope of the present invention."  *Id*. at 7:30-35.  CXT's expert's unrebutted testimony further establishes that a POSITA would not limit this term to merely being directed at applet technology.  Ex. D, ¶¶ 66-71.

Defendants do not assert disclaimer, disavowal of scope, or lexicography, nor do they provide any expert testimony to buttress their position.  Accordingly, there is no reason to import a limitation from the specification.  *See Superguide Corp. v. DirecTV Enters., Inc*., 358 F.3d 870, 875 (Fed. Cir. 2004) ("a particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment."); *see also Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (*en banc*) ("we have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment").

Accordingly, Defendant's proposed construction should be rejected, and the term should be afforded its plain and ordinary meaning.

G.  **"automatically managing subsequent authentications of the consumer with the database management system so that the consumer will not be required to again input the consumer authentication information"** (Claims 1-2, 13, 15-18, 20-22, 27-28, 36-38 of the '875 Patent) **(No. 29)**

| CXT's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| Plain and ordinary<br><br>Alternatively,<br><br>"automatically managing subsequent authentications of the consumer with the database management system, which is at the host server, so that the consumer will not be required to again input the consumer authentication information" | "automatically managing subsequent authentications of the consumer with the database management system at the host server so that the consumer will not be required to again input the consumer authentication information" |

The parties' key dispute as to this term is whether the term should be limited to a preferred embodiment where authentications are performed at the host server.  Yet, in the absence of lexicography or disclaimer, Defendants' attempt to limit the claims to an embodiment in the specification should be rejected and the term should be afforded its plain and ordinary meaning.

The specification of the '875 Patent makes clear that the authentication of the consumer with the database management system at a host server is only one of many embodiments of the single sign-on mechanism.  For example, the '875 Patent discloses that:

> At step 1106 the consumer authentication information, the browser identifier, the sign-on time and any other information associated with the sign-on process are stored in an authentication table 113, *which is preferably maintained at the host server* 108. . . . The host server 108 may utilize the database management system 109 for interacting with the authentication table 113*. The authentication table 113 may alternatively be stored in another location accessible by the host server 108, such as the data repository 102, or another network server*.

('875 Patent at 23:62-24:7; emphasis added.)   As the Patentee disclosed more than one embodiment of the single-sign on mechanism, there is no reason to import a limitation from the

specification when the claim language is broader.  *See Superguide*, 358 F.3d at 875 (Fed. Cir. 2004) ("a particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment.")

Additionally, Defendants' proposed construction adds the limitation "at the host server" to this claim element.  Yet, the term "host server" does not appear in Claim 1 of the '875 Patent and its dependents.   Therefore, rather than clarifying the term, Defendants' proposed construction introduces ambiguity and should be rejected.

Defendants do not assert disclaimer, disavowal of scope, or lexicography.  While their "Supporting Evidence" in the Joint Claim Construction Statement vaguely refers to a July 5, 2005 Office Action Response (Dkt. 157-4 at 9), that response referred to a different limitation where authentication was done "with the host server" and not "at the host server."  Ex. F at 11. Additionally, Defendants fail to provide any expert testimony to buttress their position. Accordingly, Defendant's proposed construction should be rejected, and the term should be afforded its plain and ordinary meaning.

**H.**   **"retrieving the selected consumer information elements. . . by filtering data from the information account with the database management system" / "retrieving one or more consumer information element from the information account by filtering data from the information account"** (Claims 1, 24, 36, 50, 58, 78, 82,84-85, 88 of the '581 Patent and Claim 1 of the '875 Patent) **(No. 31)**

| CXT's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary. | "retrieving the selected consumer information by filtering data from the information account *based on vendor authentication information* with the database management system"<br><br>"retrieving the selected consumer information by filtering data from the information account *based on vendor authentication Information with the database management system*" |

The parties' key dispute as to these terms is whether the terms should be limited to a preferred embodiment wherein filtering data from the information account is done based on vendor authentication information.  Yet, in the absence of lexicography, disavowal or disclaimer, Defendants' attempt to limit the claims to an embodiment in the specification should be rejected and the term should be afforded its plain and ordinary meaning.

The specifications of the '581 and '875 Patents make clear that data may generally be filtered from an information account and not necessarily based on vendor authentication information.  For example, these patents disclose:

- "Using **any** well-known XML-related querying, parsing, transforming and/or filtering techniques, individual data elements in the information account may be accessed, updated, deleted, created, or otherwise manipulated" ('875 at 4:67-5:4; '581 at 4:24-29; emphasis added).

- "A transformation or filtering mechanism, such as 'Style Sheets,' may be applied to the single XML data stream in order to extract only selected data elements therefrom at the direction of the consumer." ('875 at 5:15-18; '581 at 4:40-44)

- "In response to authenticating the server-side application 107 and identifying the **appropriate** filter, consumer information may be filtered from the information account 110 and transmitted back to the server-side application 107." ('875 at 10:49-53; '581 at 10:30-34; emphasis added)

- "Depending on the structure of the information account, the DBMS 109 may retrieve certain products (identified by product ID) from the information account 110, or may retrieve a set of data elements filtered according to a vendor ID or an **application ID**." ('875 at 18:4-8; '581 at 17:47-51; emphasis added)

Defendants do not assert disclaimer, disavowal of scope, or lexicography.  While their "Supporting Evidence" in the Joint Claim Construction Statement vaguely refers to a November 11, 2004 Office Action Response without citing any specific pages, there is no disavowal in the record.  As the Patentee disclosed more than one embodiment of filtering and broadly claimed filtering, there is no reason to import a limitation from the specification.  *See Superguide*, 358 F.3d at 875 (Fed. Cir. 2004) ("a particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment.")

Accordingly, Defendants' proposed construction should be rejected, and the term should be afforded its plain and ordinary meaning.

I.  **"database management system"** (Claims 1, 6, 13, 16, 24, 31-32, 36, 50, 58, 78-79, 82, 84-85, 88 of the '581 Patent, Claims 1, 8, 27 of the '875 Patent, and Claims 16, 24 of the '806 Patent) **(No. 33)**

| CXT's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary | "system software hosted on the host server for storing and accessing information on the central data repository |

This term does not require construction, as a person of ordinary skill in the art would have reasonable certainty about the scope of the terms from their context in the claims and specification.

Defendants' proposed construction seeks to define "database management system" as "system software hosted on the host server for storing and accessing information on the central data repository," without lexicographic support.  For this definition, Defendants cite passages which do not support the proposed construction, apparently seeking to combine elements from a number of disclosed embodiments as limitations.  *See e.g.* '581 Patent at 2:13-15 ("[i]n accordance with one embodiment, a host server hosting a database management system for accessing the information account receives a request from a network device"); *id.* at 2:58-65 ("In

alternative embodiments. . . the vendor server may execute a server side application for interacting with the database management system of the host server.  The server-side application may receive the filtered consumer information elements from the database management system and integrate the filtered consumer information elements into a vendor's business process on behalf of the consumer"); *See Superguide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004) ("a particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment").   Notably, this construction would add the term "host server" to many claims which do not include any such limitation.  *See e.g.* '581 Patent at claims 1 and 24; '875 Patent at Claim 1; '806 Patent at Claims 16 and 24.  Moreover, the term "system software" does not appear in the Asserted Patents at all. Thus, Defendants' construction unnecessarily complicates and adds ambiguity to the claims by adding unclaimed and undefined phrases, increasing confusion instead of providing clarity, and unduly limits the scope of "database management system."

Accordingly, Defendants' proposed construction for "database management system" should be rejected.

To the extent that the Court determines that "database management system" requires construction, Plaintiff submits that the term should be construed to mean "software for storing and accessing information in a database."

 Defendants may argue that the DBMS is necessarily hosted on the host server.  But, in the absence of any "host server" term in many of the claims at issue, claim differentiation weighs strongly against this added limitation.  *See e.g.* '581 Patent at claims 1 and 24; '875 Patent at claim 1; '806 Patent at claims 16 and 24.  Further, figures in each patent show the host server and database management system as separate structures. *See e.g.* '581 Patent at FIG. 5

(reproduced below).   Different embodiments in the specification also refer to a host server hosting a database management system" ('581 Patent at 2:13-15) and a "database management system"of the host server" (*id.* at 2:60-61), implying a difference in hosting.   Accordingly, it would be improper to read a "hosted on the host server" limitation into the meaning of "database management system.



*FIG. 5*

Defendants may further argue that the database management system necessarily accesses information "on the central data repository," as opposed to "in a database."   But inserting this term is redundant and unnecessarily limiting, as database management system terms already refer to the "central data repository" where the patentee intended to do so.   *See e.g.* '875 Patent at Claim 1 ("authenticating the consumer with the **database management system** based on the

consumer authentication information, thereby providing the consumer with access to the information account **stored in the central data repository"**).  Here, the superfluity weighs against reading the term "central data repository" into a claim where it did not originally exist. *See* '581 Patent Claim 78.

Accordingly, to the extent that the Court determines "database management system" requires construction, the term should be construed to mean "software for storing and accessing information in a database."

> **J.**   **"name field / geographic address field"** (Claims 1, 17, 19, 27 of the '875 Patent) **(No. 42) / "information account / personal information account"** (Claims 1, 9-10, 18-19, 21, 23-24, 29-30, 34-36, 39, 50, 55, 58-59, 64-65, 73-74, 76-79, 82-85, 87-88 of the '581 Patent) **(No. 43) / "information element"** (Claims 1-5, 7-15, 17-23, 25-27 of the '806 Patent and Claims 1, 2, 4, 7-12, 14-20, 22, 24-25, 27-30, 32-36, 38, 39, 41, 45-55, 57-60, 62-67, 69-79, 82-88) (No. 110) / **"authentication information"** (Claims 1-2, 4, 24, 41, 43, 45, 51-52, 59, 79, 83, 87 of the '581 Patent) **(No. 111)**

| CXT's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary | Term is not entitled to any patentable weight under printed matter doctrine. |

The above terms do not require further construction by the Court and are entitled to patentable weight.  Rather than advance a construction, Defendants contend that these terms are "not entitled to any patentable weight under the printed matter doctrine."  But, none of the claim terms at issue is directed to "printed matter," so the printed matter doctrine does not apply.  Moreover, even if the printed matter doctrine did apply, each of the claim terms in question has a functional or structural relation to the substrate, and is therefore entitled to patentable weight regardless.

The printed matter doctrine provides that claim terms directed to printed matter are not entitled to patentable weight unless the printed matter is functionally related to the substrate on

which the printed matter is applied.  *See e.g. In re DiStefano*, 808 F.3d 845, 848 (Fed. Cir. 2015).

"[A] limitation is only printed matter if it claims the content of information."  *Id.* at *848

(holding that a claim term, "selecting a first element from a database including web assets

authored by third party authors and web assets provided to the user interface from outside the

user interface by the user" is not directed at printed matter); *In re Lowry*, 32 F.3d 1579, 1583-84

(Fed. Cir. 1994) (holding that a computer-based structural database was not printed matter

because the data structures "contain[ed] both information used by application programs and

information regarding their physical interrelationships within a memory").  *See Cf. AstraZeneca

LP v. Apotex, Inc.*, 633 F.3d 1042, 1048 (Fed. Cir. 2010) (holding that a label providing dosage

instructions for using a medical product was printed matter); *King Pharm., Inc. v. Eon Labs,

Inc.,* 616 F.3d 1267, 1279 (Fed. Cir. 2010) (holding that a label instructing a patient to take a

drug with food was printed matter); *In re Ngai*, 367 F.3d 1336, 1337–38 (Fed. Cir. 2004)

(holding that instructions for performing DNA tests were printed matter); *In re Gulack*, 703 F.2d

1381, 1385 (Fed. Cir. 1983) (holding that numbers printed on a wristband were printed matter).

"The common thread amongst all these cases is that printed matter must be matter claimed for

what it communicates."  *In re Distefano*, 808 F.3d 845, 850 (Fed. Cir. 2015).  Even where the

printed matter doctrine applies, matter should nonetheless be given patentable weight "if the

claimed information has a functional or structural relation to the substrate." *Id.*

None of the terms at issue is claimed for the content of the information therein, such that

the claim is directed at the information those words communicate.  The words "name field /

geographic address field" do not provide a reader with information claimed by the patent, as do

the words of labels and medical instructions.  *See King Pharm.,* 616 F.3d at 1279.  Nor do the

words "information account" / "personal account information," "information element," or

"authentication information" communicate some item of information to which the claims are directed – a claim term is not printed matter simply because it includes the word "information," nor because the claim term is directed to data management.  *See Lowry*, 32 F.3d 1579.  As was the case in *DiStefano*, these claim terms are directed at various functional elements ultimately populating classes of information on an interface, as opposed to the specific information content of any disclosure in the claims.  *See DiStefano*, 808 F.3d at 848.

Further, because of their functional relation to the "substrate" (*i.e.* system comprising data repository, DBMS, servers, application, and browser), each of the claim terms in question would be entitled to patentable weight even if it were printed matter.  The terms "name field / geographic address field" describe elements of data (*i.e.* consumer information elements) stored in a central data repository functional to automatically populate corresponding input fields of a displayed web page file.  The terms "information account" / "personal account information," is functional to identify "information elements" stored on a database in connection with some account, and ultimately autopopulate information elements into input fields.    Finally, "authentication information" is functional to authenticate a consumer to a database management system.    Each of these functions impacts the claimed system significantly beyond communicating the words of the claim term.

Accordingly, the printed matter doctrine does not apply, and the terms do not require further construction.  Moreover, even if the printed matter doctrine did apply, the terms in question would be entitled to patentable weight.

**K.**    **"web-site" / "website" / "web site"** (All Claims of the '875 Patent and Claims 84, 87-88 of the '581 Patent) **(No. 44) / "subsequent website"** (Claims 1, 17, 27 of the '875 Patent) **(No. 75)**

| CXT's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Web-site: Plain and ordinary | Web-site: "a group of related web pages associated with a single domain name, including any of its subdomains" |
| Subsequent website: Plain and ordinary | Subsequent web-site: "a group of webpages associated a domain name that is different from the initial domain name, including any of its subdomains" |

The key dispute as to these terms is whether a website comprises all the web pages hosted on a single domain and its subdomains or whether a domain may host multiple website. CXT maintains that a domain may host multiple web-sites and in the absence of any lexicography, disavowal or disclaimer, Defendants' attempt to craft a non-infringement position should be rejected, and these terms should be afforded their plain and ordinary meaning.

Defendants' construction for "subsequent website" lacks any support from the intrinsic evidence. The term "subsequent website" appears in the specification only twice, in the following passage:

> Since a consumer's information account 110 may be accessible from more than one website, the authentication status may be handled in such a way so as to "follow" the consumer as the consumer accesses subsequent websites. At such subsequent websites, a consumer who has activated the single sign-on mechanism need not re-enter authentication information, assuming certain conditions are present.

'875 Patent at 22:30-38. The term, as used here, does not impart the limitations that such a "subsequent website" be "a group of webpages," nor would a POSITA understand the term "subsequent" (i.e., loaded after authentication) to require a domain name "different from the initial domain name."

Indeed, a POSITA would understand that during the relevant time period when the applications that matured to the '875 and '581 Patents were originally filed, up through the present date, a single domain may host multiple different website.  Ex. D, ¶¶ 77-82.  These include different websites hosted at the "tripod.com" domain in the early 2000s:



http://taxonomist.tripod.com (as on May 20, 2000)



http://malawi.tripod.com (as of August 16, 2000)



http://megmatthews.tripod.com (as on October 2, 2000)

Additional examples of a single domain hosting multiple websites occur in the context of e-Commerce websites, such as the myshopify.com or wixsite.com domain. *See* https://help.shopify.com/en/manual/domains ("By default, your primary domain is in the form of examplestore.myshopify.com"); *see also* https://support.wix.com/en/article/building-a-website-for-free ("Free Wix domain (username.wixsite.com/siteaddress).")

In light of this background, a POSITA would understand that a "subsequent website" may be hosted at the same domain as a first website. Ex. D, ¶¶ 77-82. In contrast, Defendants fail to cite to any intrinsic evidence or expert testimony in support of their narrow construction.

Accordingly, Defendants' proposed construction should be rejected, and the term should be afforded its plain and ordinary meaning.

L.      **"host servers" (Claim 17 of the '875 Patent) (No. 57)**

| CXT's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| "host server" (typo) | Indefinite |

This term should be construed as "host server," as a person of ordinary skill in the art would understand that "host serve*rs*" is a typographical error with reasonable certainty from its context in the claims, and based on the specification. In order to prevail on indefiniteness, Defendants must show that the claims fail to "inform those skilled in the art about the scope of the invention with reasonable certainty." *Sonix Tech. Co.*, 844 F.3d at 1377. Further, "[i]ndefiniteness must be proven by clear and convincing evidence." *Id*. As Defendants cannot meet this high burden, this Court should reject their invitation to invalidate the claim.

The relevant part of Claim 17 states, "[a] computer-implemented method for accessing an information account stored in a central data repository that is accessible via a distributed network and is coupled to a host servers." Due to the lack of agreement between the preceding term and

the plural noun "host servers," and the use of the singular "host server" throughout claim 17 and the '875 Patent specification, a person of ordinary skill in the art would understand that "host servers" means "host server" in this context.  Ex. D, ¶¶ 94-96.

Accordingly, "host servers" should be construed as "host server."

**M.** **"selected consumer information elements"** (Claims 1, 24, 36, 50 of the '581 Patent) **(No. 87)**

| CXT's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and Ordinary | "consumer information elements that correspond with the input fields that are to be populated and displayed" |

This term requires no construction.  Defendants' construction seeks to define "selected consumer information elements" as "consumer information elements that correspond with the input fields that are to be populated and displayed."  In the absence of any lexicography, disavowal or disclaimer, Defendants' attempt to craft a non-infringement position should be rejected and these terms should be afforded their plain and ordinary meaning. Moreover, Defendants proposed construction contradicts discussion in the specification.

The '581 specification first explains that "[t]he information account may be structured as one or more data aggregates, e.g., XML data aggregates . . . containing all of the information associated with the given record."  In one embodiment, all consumer information in the information account may be stored in a single XML data aggregate comprising consumer information elements and sub-elements.  In an alternative embodiment, the information account may be normalized into a plurality of discrete data aggregates, each aggregate representing a predetermined 'information product.'" 581 Patent at 4:30-47. The '581 Patent goes on to disclose that "FIG. 3 provides an abstract illustration of an information account 110 in accordance with other exemplary embodiments of the present invention.  In the embodiment shown, an

information account 110 is structured as multiple discrete XML aggregates 302 a-c.  The discrete XML aggregates 302 a-c may comprise one primary "profile" record 302 a and one or more information product records 302 b-c. . .  Information product records 302 b-c contain consumer information elements that, for example, are specific to a particular product or service offered by a vendor, or that are important to vendors with similar consumer information needs. Aggregation of data elements according to information products allows quick and efficient retrieval of specific consumer information from the information account 110 through a request-response system." Id. at 11:63-12. It follows that the XML data aggregates of Fig. 3, pictured below, are examples of selected consumer information elements in some embodiments.



FIG. 3

Many information elements within any given selected aggregate do not necessarily "correspond with the input fields that are to be populated and displayed" of a given page,

contradicting Defendants' proposed construction.  For example, in disclosed embodiments, a web page file may lack an input field for "Account_No," despite a corresponding network device receiving that selected consumer information element in any given selected aggregation of consumer information elements (e.g. 302b).  Thus, Defendants' construction would both contradict the specification, and would limit "selected consumer information elements" to only those that "correspond with the input fields that are to be populated and displayed" without support in the claims or specification.  Accordingly, Defendants' proposed construction should be rejected.

N.    **"the system of claim 58, wherein the host server further executes computer-executable instructions for: in response to transmitting the selected consumer information elements to the network device, receiving an acknowledgment from the network device indicating that the selected consumer information elements were used to complete a transaction, the acknowledgment including transaction information; and storing the transaction information in a transaction log associated with the information account in the central data repository"** (Claim 77 of the '581 Patent) (**No. 121**)

| CXT's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| Plain and Ordinary | Indefinite |

This term — the entirety of claim 77 — does not require construction as a person of ordinary skill in the art would understand its meaning with reasonable certainty from its context in the claims and based on the specification.  In order to prevail on indefiniteness, Defendants must show that the claims fail to "inform those skilled in the art about the scope of the invention with reasonable certainty." *Sonix Tech. Co.*, 844 F.3d at 1377.  Further, "[i]ndefiniteness must be proven by clear and convincing evidence." *Id.*  As Defendants cannot meet this high burden, this Court should reject their invitation to invalidate the claim.

Defendants' proposed constructions do not identify any evidence in support of their contention that the term is indefinite.  Conversely, the specification sets forth that "Each time the

profile record **302** *a* or an information product record **302** *b-c* is acted upon, detailed transaction information **408** may be recorded in a new transaction log record **406**.  As mentioned above, transaction information **408** may be used for the purpose of maintaining consistency among redundant data elements.  Another or additional purpose of the transaction information **408** is to provide the basis for all transaction billing and revenue sharing events.  By way of example only, the transaction record **406** may identify the vendor server through which the information account **110** was created.   The transaction record **406** may also identify the vendor server through which a transaction was completed using the information account **110**." '581 Patent at 13:46-59.

Accordingly, this claim term does not require construction, and is definite.

**O.**   **"information account comprising a plurality of consumer information elements associated with a consumer and being subject to the consumer's control and management" / "information account comprising a plurality of consumer information elements associated with a consumer and being subject to the consumer's control and management"** (Claims 1, 24, 58, 88 of the '581 Patent and Claims 1, 11, 19 of the '806 Patent) **(No. 126)**

| CXT's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| Plain and Ordinary | "a comprehensive information profile that: (a) contains consumer information elements associated with a consumer; and (b) for which the consumer controls the types, amounts, and recipients of information stored in the account." |

These terms do not require construction, as a person of ordinary skill in the art would have reasonable certainty about the scope of the terms from their context in the claims and specification.

Defendants' proposed construction improperly deviates from the claims, specification, and ordinary and customary meaning of the terms.  Specifically, Defendants (1) unnecessarily

replace "information account" with the words "comprehensive information profile," a term which the specification defines as meaning the same thing, but only uses once; (2) replace the words, "comprising a plurality of" with "contains," unduly limiting claim scope; and (3) replace the words "being subject to the consumer's control and management" with the words "for which the consumer controls the types, amounts, and recipients of information stored in the account,"" unnecessarily complicating and adding ambiguity to the claims by adding numerous unclaimed and undefined phrases.  Accordingly, Defendants' proposed construction should be rejected.

      **P.**      **"prior to transmitting the request from the network device for the determined one or more consumer information elements, receive and execute at the network device the client-side application configured to manage the request/response process for the network device"** (Claim 19 of the '806 Patent) **(No. 130)**

| CXT's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and Ordinary | Indefinite |

This term does not require construction as a person of ordinary skill in the art would understand its meaning with reasonable certainty from its context in the claims, and based on the specification.  In order to prevail on indefiniteness, Defendants must show that the claims fail to "inform those skilled in the art about the scope of the invention with reasonable certainty." *Sonix Tech. Co.*, 844 F.3d 1370 at 1377.  Further, "[i]ndefiniteness must be proven by clear and convincing evidence." *Id.* As Defendants cannot meet this high burden, this Court should reject their invitation to invalidate the claim.

Defendants' proposed constructions identify only the "'581 Patent at, e.g., 2:40-43" as "intrinsic" evidence, despite the claim term in question originating from the '806 Patent. Moreover, the cited passage which states, "[p]referably, the client-side application temporarily

resides on the client device and is configured to manage the request/response process for the network device," provides additional support for certain embodiments of the claimed term, rather than establishing indefiniteness.

Defendants may argue that this term is indefinite because the words "receive" and "execute" are not gerunds, but such precision is not required.  *See Oyster Optics, LLC v. Coriant Am. Inc.*, No. 2:16-CV-1302-JRG, 2017 WL 6026729, at \*21 (E.D. Tex., Dec. 5, 2017), opinion clarified, No. 2:16-CV-1302-JRG, 2018 WL 3067727 (E.D. Tex., June 21, 2018) ("although the proper antecedent basis for the phrase 'the optical signals' is not explicit, the claim is nonetheless readily understandable"); *Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367, 1376 (Fed. Cir. 2008) (noting 'the well-settled rule that claims are not necessarily invalid for a lack of antecedent basis').  It would be readily apparent to a POSITA that "receive" and "execute" mean "receiving" and "executing" given the prior gerund used in that term ("transmitting"), the preamble of claim 19 ("comprising at least one processor programmed to execute a method comprising"), and the presence of other gerunds throughout claim 19 (*e.g.* "determining," "causing," "receiving," "filtering," and "autopopulating"").

Accordingly, this term does not require construction as a person of ordinary skill in the art would understand its meaning with reasonable certainty.

## Q.   Disputed Ordering of Steps in Method Claims (Dkt. No. 158)[3]

Asserted claims 36 and 50 of the '581 Patent, and 1, 11, 19, and 27 of the '806 Patent each comprise a number of steps, or a system configured to execute the steps comprised therein. Tailored Brands' proposes constructions that would allow only limited deviation from the order written, needlessly importing certain embodiments disclosed in the specifications as limitations.

---

[3] Defendant Tailored Brands, Inc. and Plaintiff CXT filed a supplemental joint claim construction statement with respect to the ordering of steps in certain method claims (Dkt. No. 158).  This section addresses the issues raised therein.

*See* Dkt. No. 158-2; *see also* '875 Patent at Fig. 11.  CXT submits that the claims are not so limited.

CXT does not oppose Tailored Brands' construction   that "[w]here a step is performed "in response to" another action, the step must occur at some time after the other action," in: claims 1, 17, and 27 of the '875 Patent; claims 1, 22, 24, 36, 39, 58, 77, and 82 of the '581 Patent; and claims 8, 11, 18 and 19 of the '806 Patent.

CXT does not oppose Tailored Brands' construction that "[w]here a step refers to an antecedent step using a definite article, the step must occur at some time after the antecedent step," only as to the terms "retrieving" / "the retrieved" at claims 1, 17, 27, and 39 of the '875 Patent.

CXT does not oppose Tailored Brands construction that "[w]here a step refers to an antecedent step using a definite article, the step must occur at some time after the antecedent step," only as to the terms "determining" / "the determined" at claims 1, 11, 19, and 27 of the '806 Patent.

CXT maintains its opposition as to Tailored Brands Construction that "[w]here a step refers to an antecedent step using a definite article, the step must occur at some time after the antecedent step," as to the terms "the filtered one or more consumer information elements"  and "the selected consumer  information elements," which Tailored Brands purports to apply to "all claims." CXT maintains its opposition to Tailored Brands proposed constructions 1-7. See Dkt. No. 158-2 at 3-9.

Except where a step explicitly occurs "prior to" or "in response to" another claim, or logically occurs after an antecedent step (*i.e.* "retrieving" / "the retrieved," "determining" / "the determined," and "transmit a request . . . for retrieval" / "retrieving"), the claims need not be construed to require any further order of steps.  Moreover, the ordered claims need not occur consecutively (*i.e.* [**c**]→[**d**]→[**e**]).  Rather, the claim language and specification allow a concurrent, or merely sequential (*i.e.* [**c**]→[f]→[**d**]→[**e**]), occurrence of steps.  Additionally, it is CXT's position that "the selected consumer information elements" and "the filtered one or more consumer information elements" each refer to an article of data described in the specification, rather than the product of some antecedent step, and thus need not be construed to occur in any particular order.  *Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1342–43 (Fed. Cir. 2001) ("Unless the steps of a method actually recite an order, the steps are not ordinarily construed to require one."); *see also TALtech Ltd. v. Esquel Apparel, Inc.*, 279 Fed. App'x. 974, 978 (Fed. Cir. 2008).  ("A claim only "requires an ordering of steps when the claim language, as a matter of logic or grammar, requires that the steps be performed in the order written, or the specification directly or implicitly requires such a narrow construction.")

Accordingly, Defendant Tailored Brand's narrow construction is unsupported and should be rejected.

## IV.    CONCLUSION

For the foregoing reasons, CXT respectfully requests that the Court adopt its proposed constructions for the disputed terms and phrases of the '875 Patent, the '581 Patent, and the '806 Patent.

Dated: June 12, 2019                                    **BROWN RUDNICK LLP**

                                                                     */s/ Alfred R. Fabricant*
                                                                      Alfred R. Fabricant

NY Bar No. 2219392
Email: afabricant@brownrudnick.com
Peter Lambrianakos
NY Bar No. 2894392
Email: plambrianakos@brownrudnick.com
Vincent J. Rubino, III
NY Bar No. 4557435
Email: vrubino@brownrudnick.com
Shahar Harel
NY Bar No. 4573192
Email: sharel@brownrudnick.com
**BROWN RUDNICK LLP**
7 Times Square
New York, NY 10036
Telephone: 212-209-4800
Facsimile: 212-209-4801

Justin Kurt Truelove
Texas State Bar No. 24013653
Email: kurt@truelovelawfirm.com
**TRUELOVE LAW FIRM, PLLC**
100 West Houston
Marshall, Texas 75670
Telephone: 903-938-8321
Facsimile: 903-215-8510

**ATTORNEYS FOR PLAINTIFF,
CXT SYSTEMS, INC.**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on June 12, 2019, all counsel of record who are

deemed to have consented to electronic service are being served with a copy of this document via

the Court's CM/ECF system per Local Rule CV-5(a)(3).

*/s/ Alfred R. Fabricant*

Alfred R. Fabricant

63423184 v3