**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| CXT SYSTEMS, INC., | § § § § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § § | Case No. 2:18-cv-00171-RWS-RSP |
| | § | (LEAD CASE) |
| ACADEMY, LTD., D/B/A ACADEMY | § | |
| SPORTS + OUTDOORS, ET AL., | § | |
| *Defendants.* | § § | |

## <u>CLAIM CONSTRUCTION MEMORANDUM OPINION AND ORDER</u>

Before the Court is the opening claim construction brief of CXT Systems, Inc. ("Plaintiff") (Dkt. No. 181, filed on June 12, 2019),[1] the response of Academy Ltd., Fossil Group, Inc., Specialty Retailers, Inc., Tailored Brands, Inc., Conn's, Inc., J. C. Penney Corporation, Inc., Pier 1 Imports (U.S.), Inc., and Pier 1 Services Company (collectively "Defendants") (Dkt. No. 188, filed on July 3, 2019),[2] and Plaintiff's reply (Dkt. No. 189, filed on July 11, 2019). The Court held a hearing on the issues of claim construction and claim definiteness on August 1, 2019. Having considered the arguments and evidence presented by the parties at the hearing and in their briefing, the Court issues this Order.

---

[1] Citations to the parties' filings are to the filing's number in the docket (Dkt. No.) and pin cites are to the page numbers assigned through ECF.
[2] Defendants replaced two briefs filed on June 28, 2019 (Dkt. No. 186; Dkt. No. 187) with an amended brief (Dkt. No. 188). The Court considers only the amended brief.

# Table of Contents

I.      **BACKGROUND** ........................................................................................................ **4**

II.      **LEGAL PRINCIPLES** ......................................................................................... **6**

       A.      Claim Construction ........................................................................................ 6

       B.      Departing from the Ordinary Meaning of a Claim Term.......................... 9

       C.      Functional Claiming and 35 U.S.C. § 112, ¶ 6 (pre-AIA) / § 112(f) (AIA) ......... 10

       D.      Definiteness Under 35 U.S.C. § 112, ¶ 2 (pre-AIA) / § 112(b) (AIA) ................ 12

III.      **AGREED CONSTRUCTIONS** ......................................................................... **13**

IV.      **CONSTRUCTION OF DISPUTED TERMS** .................................................... **23**

       A.      "temporary portion" / "client-side application having at least a temporary portion" .................................................................................................... 23

       B.      "processing module for processing" and "processing module"........................... 26

       C.      "application configured to manage a request/response process," "application configured to manage the request/response process," and "prior to transmitting the request from the network device for the determined one or more consumer information elements, receive and execute at the network device the client-side application configured to manage the request/response process for the network device".......................... 29

       D.      "server-side application for interacting with the central repository," "server-side application for interacting with a database management system," and "server-side application configured for communication with a host server that hosts a central data repository"................................................. 33

       E.      "single sign-on mechanism" ......................................................................... 38

       F.      "automatically managing subsequent authentications of the consumer with the database management system so that the consumer will not be required to again input the consumer authentication information"...................................... 42

       G.      "retrieving one or more consumer information element from the information account by filtering data from the information account" and "retrieving the selected consumer information elements . . . by filtering data from the information account with the database management system"........ 45

       H.      "database management system"........................................................................ 49

       I.      "web-site," "website," "web site," and "subsequent website".............................. 52

       J.      "host servers" ................................................................................................ 55

       K.      "selected consumer information elements" ....................................................... 59

       L.      "access to the information account" ................................................................ 61

       M.      "information account comprising a plurality of consumer information elements associated with a consumer and being subject to the consumer's

control and management" and "information account comprising a plurality of consumer information elements associated with a consumer and subject to the consumer's control and management" ......................................................... 63

N.     "name field," "geographic address field," "information account," "personal information account," "information element," and "authentication information" ............................................................... 66

**V.**     **CONCLUSION** ............................................................................................. **67**

# I.    BACKGROUND

Plaintiff alleges infringement of three U.S. Patents: No. 7,016,875 (the "'875 Patent"), No. 7,257,581 (the "'581 Patent"), and No. 8,260,806 (the "'806 Patent") (collectively, the "Asserted Patents"). The patents are related through a chain of continuation and continuation-in-part applications. Specifically, the '875 Patent issued from an application that was a continuation-in-part of the application that issued as the '581 Patent. The '806 Patent issued from an application that was a continuation of the application that issued as the '581 Patent. The earliest priority claim in each of the Asserted Patents is to an application filed August 4, 2000.

In general, the Asserted Patents are directed to technology for storing, managing, and distributing consumer information to, e.g., ease a computer user's provision of authentication and other information to various vendors for electronic transactions.

The abstract of the '875 Patent provides:

> Systems and methods for providing access to an information account stored in a central data repository. The information account is associated with a consumer and is subject to the consumer's control and management. Consumer authentication information is input by the consumer in connection with a first request for access to the information account via a first web-site. Responsive to authentication of the consumer, a single sign-on feature may be activated for automatically managing subsequent authentications of the consumer so that the consumer will not be required to again input the consumer authentication information upon initiating a second request for access to the information account while interacting with a subsequent web-site that is configured to provide access to the information account upon authentication of the consumer. The single sign-on function may be deactivated upon the occurrence of a terminating event, such as the expiration of a time-out interval.

The abstracts of the '581 and '806 Patents are substantially identical and provide:[3]

> Consumers may centrally store, manage and distribute information using an information account stored in a central data repository. The information account is accessible from any client device, without the need to permanently store or install

---

[3] A certificate of correction was filed for some of the asserted patents. Alterations to the Asserted Patents through a certificate of correction are denoted herein by underlining added material and striking through deleted material.

proprietary software thereon. The information account comprises a plurality of consumer information elements stored in a tagged data format. A host server hosts a database management system for accessing the information account. A client-side application may manage communications with the host server. Alternatively, the client device may interact with a vendor server that executes a server-side application for managing communications with the host server. In response to a request from the consumer, the host server may filter selected consumer information elements from the information account and transmit the filtered consumer information elements to the client-side or server-side application. The filtered consumer information elements may then be automatically integrated into a vendor business process on behalf of the consumer, if desired.

Claim 27 of the '875 Patent is provided here as an exemplary system claim:

**27**. A system storing, managing and distributing consumer information via a distributed network, comprising:

a central data repository accessible via the distributed electronic network for storing an information account, the information account containing consumer information elements that are changed by the consumer, a first consumer information element of the information account comprising one or more name fields to identify the consumer, a second consumer information element of the information account comprising one or more geographic address fields associated with the consumer; and

a host server for communicating with the central data repository and with a network device via the distributed electronic network and for executing computer-executable instructions for:

receiving with the host server, over the distributed electronic network, a first request from the network device for access to the information account and consumer authentication information in response to the consumer manually inputting the consume authentication information while interacting with a first web-site;

in response to the request, authenticating the consumer with the host server based on the consumer authentication information, thereby providing the consumer with access to the information account stored in the central data repository;

in response to authenticating the consumer, automatically managing subsequent authentications of the consumer with the host server so that the consumer will not be required to again input the consumer authentication information upon initiating a second request for access to the information account while interacting with a subsequent web-site that is configured to provide access to the information account upon authentication of the consumer;

in response to the first, second, and subsequent requests for access to the information account stored in the central data repository, retrieving one or more consumer information elements from the information account with the host server by filtering data from the information account with

the database management system based on an identification of a web-site being accessed be the consumer;

sending the retrieved consumer information elements over the distributed electronic network;

parsing the retrieved consumer information elements; and

auto-populating input fields of a displayed web page file of the web-site being accessed by the consumer with the consumer information elements.

Claim 36 of the '581 Patent is provided here as an exemplary method claim:

**36**. A computer-implemented method for storing, managing and distributing consumer information via a distributed electronic network, the method comprising the steps of:

hosting a web page file accessible via the distributed electronic network by a client device executing a browser, the web page file prompting a consumer to input selected consumer information elements; and

executing a server-side application configured for communication with a host server that hosts a central data repository, the server-side application operable to:

determine the selected consumer information elements that are to be input into the web page file by the consumer,

transmit a request to the host server for retrieval of the selected consumer information elements from an information account associated with the consumer,

~~retrieving~~ retrieve the selected consumer information elements by filtering data from the information account with a database management system,

in response to receiving the selected consumer information elements from the host server, ~~passing~~ pass the selected consumer information elements to a processing module for processing, and

~~autopopulating~~ autopopulate the selected information elements into at least one input field of a web pare file.

## II.   LEGAL PRINCIPLES

### A.   Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *Id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d

858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. The general rule—subject to certain specific exceptions discussed *infra*—is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.") (vacated on other grounds).

"The claim construction inquiry … begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "[I]n all aspects of claim construction, 'the name of the game is the claim.'" *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (quoting *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998)). First, a term's context in the asserted claim can be instructive. *Phillips*, 415 F.3d at 1314. Other asserted or unasserted claims can also aid in determining the claim's meaning, because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.* For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id.* at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive;

it is the single best guide to the meaning of a disputed term.'" *Id*. (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The prosecution history is another tool to supply the proper context for claim construction because, like the specification, the prosecution history provides evidence of how the U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent. *Phillips*, 415 F.3d at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* at 1318; *see also Athletic Alternatives, Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguous prosecution history may be "unhelpful as an interpretive resource").

Although extrinsic evidence can also be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use

claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id*. at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are not helpful to a court. *Id*. Extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id*. The Supreme Court has explained the role of extrinsic evidence in claim construction:

> In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period. *See, e.g., Seymour v. Osborne*, 11 Wall. 516, 546 (1871) (a patent may be "so interspersed with technical terms and terms of art that the testimony of scientific witnesses is indispensable to a correct understanding of its meaning"). In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the "evidentiary underpinnings" of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal.

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

## B. Departing from the Ordinary Meaning of a Claim Term

There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution."[4] *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)); *see also GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir.

---

[4] Some cases have characterized other principles of claim construction as "exceptions" to the general rule, such as the statutory requirement that a means-plus-function term is construed to cover the corresponding structure disclosed in the specification. *See, e.g., CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002).

2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."). The standards for finding lexicography or disavowal are "exacting." *GE Lighting Solutions*, 750 F.3d at 1309.

To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *Id.* (quoting *Thorner*, 669 F.3d at 1365); *see also Renishaw*, 158 F.3d at 1249. The patentee's lexicography must appear "with reasonable clarity, deliberateness, and precision." *Renishaw*, 158 F.3d at 1249.

To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender. *Cordis Corp. v. Boston Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009); *see also Thorner*, 669 F.3d at 1366 ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."). "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

### C.  Functional Claiming and 35 U.S.C. § 112, ¶ 6 (pre-AIA) / § 112(f) (AIA)

A patent claim may be expressed using functional language. *See* 35 U.S.C. § 112, ¶ 6; *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347–49 & n.3 (Fed. Cir. 2015) (en banc in relevant portion). Section 112, Paragraph 6, provides that a structure may be claimed as a "means … for performing a specified function" and that an act may be claimed as a "step for performing a specified function." *Masco Corp. v. United States*, 303 F.3d 1316, 1326 (Fed. Cir. 2002).

But § 112, ¶ 6 does not apply to all functional claim language. There is a rebuttable presumption that § 112, ¶ 6 applies when the claim language includes "means" or "step for" terms, and that it does not apply in the absence of those terms. *Williamson*, 792 F.3d at 1348; *Masco*

*Corp.*, 303 F.3d at 1326. The presumption stands or falls according to whether one of ordinary skill in the art would understand the claim with the functional language, in the context of the entire specification, to denote sufficiently definite structure or acts for performing the function. *See Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1372 (Fed. Cir. 2015) (§ 112, ¶ 6 does not apply when "the claim language, read in light of the specification, recites sufficiently definite structure" (quotation marks omitted) (citing *Williamson*, 792 F.3d at 1349; *Robert Bosch, LLC v. Snap-On Inc.*, 769 F.3d 1094, 1099 (Fed. Cir. 2014))); *Williamson*, 792 F.3d at 1349 (§ 112, ¶ 6 does not apply when "the words of the claim are understood by persons of ordinary skill in the art to have sufficiently definite meaning as the name for structure"); *Masco Corp.*, 303 F.3d at 1326 (§ 112, ¶ 6 does not apply when the claim includes an "act" corresponding to "how the function is performed"); *Personalized Media Communications, L.L.C. v. International Trade Commission*, 161 F.3d 696, 704 (Fed. Cir. 1998) (§ 112, ¶ 6 does not apply when the claim includes "sufficient structure, material, or acts within the claim itself to perform entirely the recited function … even if the claim uses the term 'means.'" (quotation marks and citation omitted)).

When it applies, § 112, ¶ 6 limits the scope of the functional term "to only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof." *Williamson*, 792 F.3d at 1347. Construing a means-plus-function limitation involves multiple steps. "The first step … is a determination of the function of the means-plus-function limitation." *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). "[T]he next step is to determine the corresponding structure disclosed in the specification and equivalents thereof." *Id.* A "structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Id.* The focus of the "corresponding structure"

inquiry is not merely whether a structure is capable of performing the recited function, but rather whether the corresponding structure is "clearly linked or associated with the [recited] function." *Id.* The corresponding structure "must include all structure that actually performs the recited function." *Default Proof Credit Card Sys. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005). However, § 112 does not permit "incorporation of structure from the written description beyond that necessary to perform the claimed function." *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999).

For § 112, ¶ 6 limitations implemented by a programmed general purpose computer or microprocessor, the corresponding structure described in the patent specification must include an algorithm for performing the function. *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999). The corresponding structure is not a general purpose computer but rather the special purpose computer programmed to perform the disclosed algorithm. *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008).

### D. Definiteness Under 35 U.S.C. § 112, ¶ 2 (pre-AIA) / § 112(b) (AIA)

Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112, ¶ 2. A claim, when viewed in light of the intrinsic evidence, must "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). If it does not, the claim fails § 112, ¶ 2 and is therefore invalid as indefinite. *Id.* at 901. Whether a claim is indefinite is determined from the perspective of one of ordinary skill in the art as of the time the application for the patent was filed. *Id.* at 911. As it is a challenge to the validity of a patent, the failure of any claim in suit to comply with § 112 must be shown by clear and convincing evidence. *BASF Corp. v. Johnson Matthey Inc.,* 875 F.3d 1360, 1365 (Fed. Cir. 2017). "[I]ndefiniteness is a question of law and in

effect part of claim construction." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012).

When a term of degree is used in a claim, "the court must determine whether the patent provides some standard for measuring that degree." *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1378 (Fed. Cir. 2015) (quotation marks omitted). Likewise, when a subjective term is used in a claim, "the court must determine whether the patent's specification supplies some standard for measuring the scope of the [term]." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1351 (Fed. Cir. 2005). The standard "must provide objective boundaries for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014).

In the context of a claim governed by 35 U.S.C. § 112, ¶ 6, the claim is invalid as indefinite if the claim fails to disclose adequate corresponding structure to perform the claimed function. *Williamson*, 792 F.3d at 1351–52. The disclosure is inadequate when one of ordinary skill in the art "would be unable to recognize the structure in the specification and associate it with the corresponding function in the claim." *Id*. at 1352.

## III.    AGREED CONSTRUCTIONS

The parties have agreed to the following constructions set forth in their Joint Construction Chart (Dkt. No. 192).

| Term[5] | Agreed Construction |
|---|---|
| "auto-populating input fields of a displayed web page file of the web-site being accessed by the consumer with the consumer information elements"<br><br>• '875 Patent Claims 1, 27 | automatically populating the information elements in input fields that a user can directly modify and that are displayed in a webpage form[6] |

---

[5] For all term charts in this order, the claims in which the term is found are listed with the term but: (1) only the highest-level claim in each dependency chain is listed, and (2) only asserted claims identified in the parties' Joint Construction Chart (Dkt. No. 192) are listed.
[6] The parties submitted "automatically [populating] / [populates] / [populate] the [selected] / [filtered one or more] [consumer] / [user] information elements in input fields that a user can

| Term[5] | Agreed Construction |
| --- | --- |
| "auto-populating input fields of a displayed web nale file of the web-site being accessed by the consumer with the consumer information elements"<br><br>• '875 Patent Claim 17 | automatically populating the information elements in input fields that a user can directly modify and that are displayed in a webpage form |
| "auto-populates input fields of a displayed web page file of the web-site being accessed by the consumer with the consumer information elements"<br><br>• '875 Patent Claim 39 | automatically populates the information elements in input fields that a user can directly modify and that are displayed in a webpage form |
| "autopopulating the selected consumer information elements into at least one input field of a web page file"<br><br>• '581 Patent Claim 1 | automatically populating the selected consumer information elements in input fields that a user can directly modify and that are displayed in a webpage form |
| "autopopulating the selected consumer information elements into at least one input field of a web page file"<br><br>• '581 Patent Claim 24 | automatically populating the selected consumer information elements in input fields that a user can directly modify and that are displayed in a webpage form |
| "~~autopopulating~~ autopopulate the selected information elements into at least one input field of a web page file"[7]<br><br>• '581 Patent Claim 36 | automatically populates the selected information elements in input fields that a user can directly modify and that are displayed in a webpage form |
| "~~auto-populating~~ autopopulate the selected consumer information elements into the input fields of the web page file"[8]<br><br>• '581 Patent Claim 50 | automatically populate the selected consumer information elements in input fields that a user can directly modify and that are displayed in a webpage form |

directly modify and that are displayed in a webpage form" for the various auto-populating terms. Dkt. No. 192-1 at 8–9. The Court will not adopt this construction because it is likely to create confusion. Instead, the Court adopts the relevant permutations of the parties' proposal.

[7] The parties provided claim language in their Joint Claim Construction Chart that did not account for the Certificate of Correction entered for the '581 Patent. The Court here includes the corrections set forth in the Certificate of Correction.

[8] The parties provided claim language in their Joint Claim Construction Chart that did not account for the Certificate of Correction entered for the '581 Patent. The Court here includes the corrections set forth in the Certificate of Correction.

| Term[5] | Agreed Construction |
|---|---|
| "autopopulating the selected consumer information elements into at least one input field of a web page file"<br><br>• '581 Patent Claim 58 | automatically populating the selected consumer information elements in input fields that a user can directly modify and that are displayed in a webpage form |
| "autopopulating the selected consumer information elements into at least one input field of a web page"<br><br>• '581 Patent Claim 78 | automatically populating the selected consumer information elements in input fields that a user can directly modify and that are displayed in a webpage form |
| "autopopulating the selected consumer information elements into at least one input field of a second web page file"<br><br>• '581 Patent Claim 82 | automatically populating the selected consumer information elements in input fields that a user can directly modify and that are displayed in a webpage form |
| "autopopulating the selected consumer information elements into at least one input field of a web page"<br><br>• '581 Patent Claim 88 | automatically populating the selected consumer information elements in input fields that a user can directly modify and that are displayed in a webpage form |
| "autopopulating the filtered one or more consumer information elements into corresponding fields"<br><br>• '806 Patent Claim 1 | automatically populating the filtered one or more consumer information elements in input fields that a user can directly modify and that are displayed in a webpage form |
| "autopopulating the filtered one or more consumer information elements into corresponding input fields of the web page file displayed on the network device"<br><br>• '806 Patent Claim 11 | automatically populating the filtered one or more consumer information elements in input fields that a user can directly modify and that are displayed in a webpage form |
| "autopopulating the filtered one or more consumer information elements into corresponding input fields of the web page file displayed on the network device"<br><br>• '806 Patent Claim 19 | automatically populating the filtered one or more consumer information elements in input fields that a user can directly modify and that are displayed in a webpage form |
| "autopopulating the filtered one or more user information elements into corresponding fields"<br><br>• '806 Patent Claim 27 | automatically populating filtered one or more user information elements in input fields that a user can directly modify and that are displayed in a webpage form |

| Term[5] | Agreed Construction |
|---|---|
| "authenticating the consumer based on the authentication information"<br><br>• '581 Patent Claims 1, 24, 43, 83 | information sufficient to verify the identity of a user that is separate and distinct from consumer information elements |
| "web nale file"<br><br>• '581 Patent[9] | An HTML document or other related file that is stored on a server and that an HTTP server retrieves and returns in response to a HTTP request |
| "web page file"<br><br>• '581 Patent Claims 1, 24, 36, 58, 82 | |
| "web pare file"<br><br>• '581 Patent Claim 36 | |
| "web-page file"<br><br>• '581 Patent[10] | |
| "a system storing, managing and distributing consumer information via a distributed network"<br><br>• '875 Patent Claim 27 | a system for storing, managing and distributing consumer information via a distributed network |
| "consume authentication information"<br><br>• '875 Patent Claim 27 | consumer authentication information |
| "wherein, response to receiving the equipment identifier"<br><br>• '875 Patent Claim 44 | wherein, in response to receiving the equipment identifier |
| "consumer information elements that are changed by the consumer"<br><br>• '875 Patent Claims 1, 17, 27<br>• '806 Patent Claims 1, 17, 27 | consumer information elements that are actually changed by the consumer after having been initially input into the information account |

[9] The parties present this term in their Joint Claim Construction Chart but did not provide "complete language of disputed claims with disputed terms in bold type," as required by P.R. 4-5(d). Dkt. No. 192-1. The Court does not find this term in any claim identified in the chart provided by the parties.

[10] The parties present this term in their Joint Claim Construction Chart but did not provide "complete language of disputed claims with disputed terms in bold type," as required by P.R. 4-5(d). Dkt. No. 192-1. The Court does not find this term in any claim identified in the chart provided by the parties.

| Term[5] | Agreed Construction |
|---|---|
| "network device"<br><br>• '875 Patent Claims 1, 27<br>• '581 Patent Claims 1, 24, 58, 82<br>• '806 Patent Claim 1, 11, 19, 27 | a remote device connected via a network to a server (plain and ordinary meaning) |
| "integrate one or more consumer information elements into a vendor's business process"<br><br>• '806 Patent Claims 2, 12 | use submitted consumer information to carry out a transaction between a vendor and the consumer |
| "consumer information elements"<br><br>• '875 Patent Claims 1, 17, 27<br>• '581 Patent Claims 1, 24, 36, 58, 82<br>• '806 Patent Claim 1, 11, 19 | data or information relating to a consumer, but not including consumer authentication information" |
| "consumer authentication information"<br><br>• '875 Patent Claims 1, 17, 27<br>• '581 Patent Claims 1, 24, 41, 59, 83<br>• '806 Patent Claim 1, 11, 19 | information sufficient to verify the identity of a user that is separate and distinct from consumer information elements |
| "subsequent authentication"<br><br>• '875 Patent Claims 1, 17, 27 | authentication of the consumer with the database management system based on the consumer authentication information in response to the consumer interacting with a web-site different than the first web- site |
| "vendor server"<br><br>• '806 Patent Claim 1, 11, 19, 27 | a server of a person, business, enterprise or entity that offers for sale and sells products or services to consumers |
| "consumer authentication information"<br><br>• '875 Patent Claims 1, 17, 27<br>• '581 Patent Claims 1, 24, 41, 59, 83<br>• '806 Patent Claim 1, 11, 19 | information sufficient to verify the identity of a user that is separate and distinct from consumer information elements |
| "host server"<br><br>• '875 Patent Claims 17, 27 | the device that hosts the software for accessing information in the central data repository and for communicating with the network device[s] |
| "web page"<br><br>• '806 Patent Claims 1, 27 | an HTML file and associated files that an HTTP server returns in response to a request |

| Term[5] | Agreed Construction |
|---|---|
| Sequence of steps in a claim generally | Where a step refers to an antecedent step using a definite article, the step must occur at some time after the antecedent step. |
| Sequence of steps in Claim 36 of the '581 Patent. | Steps [c], [d], and [e] must occur in the recited order, where:[11]<br><br>• [c] is "determine the selected consumer information elements that are to be input into the web page file by the consumer,"<br>• [d] is "transmit a request to the host server for retrieval of the selected consumer information elements from an information account associated with the consumer," and<br>• [e] is "~~retrieving~~ retrieve the selected consumer information elements by filtering data from the information account with a database management system" |
| Sequence of steps in Claim 50 of the '581 Patent. | Steps [c], [d], and [e] must occur in the recited order, where:[12]<br><br>• [c] is "determine a plurality of selected consumer information elements that are to be input into input fields of the web page file,"<br>• [d] is "transmit a request to the host server for retrieval of the selected consumer information elements from the information account," and<br>• [e] is "~~retrieving~~ retrieve the selected consumer information elements by filtering data from the information account with a database management system." |

---

[11] The parties provided claim language in their Joint Claim Construction Chart that did not account for the Certificate of Correction entered for the '581 Patent. The Court here includes the corrections set forth in the Certificate of Correction.

[12] The parties provided claim language in their Joint Claim Construction Chart that did not account for the Certificate of Correction entered for the '581 Patent. The Court here includes the corrections set forth in the Certificate of Correction.

| Term | Agreed Construction |
|---|---|
| Sequence of steps in Claim 1 of the '806 Patent. | The steps must occur in the order indicated below:<br>  A computer-readable storage medium having stored thereon computer- executable instructions for storing, managing, and distributing consumer information via a distributed electronic network, by causing a computing device to perform operations comprising:<br>**1 or 2:** determining one or more consumer information elements for fields of a web page, the one or more consumer information elements associated with an information account and in a data storage accessible via the distributed electronic network, the information account comprising a plurality of consumer information elements associated with a consumer and being subject to the consumer's control and management;<br>**1 or 2:** causing a browser to display a web page file that has been retrieved from a vendor server, the web page file including an instruction that causes the browser to request transmission of a client- side application having at least a temporary portion;<br>**3:** executing at a network device an application configured to manage a request/response process for the network device;<br>**4:** transmitting over the distributed electronic network from the network device a request for the determined one or more consumer information elements the request including consumer authentication information and being made by the network device responsive to an input command supplied by the consumer;<br>**5:** receiving at the network device the one or more consumer information elements filtered from the information account; and<br>**6:** autopopulating the filtered one or more consumer information elements into corresponding fields. |

| Term | Agreed Construction |
|---|---|
| Sequence of steps in Claim 11 of the '806 Patent. | The steps must occur in the order indicated below:<br><br>A method for storing, managing, and distributing consumer information via a distributed electronic network comprising:<br><br>**1 or 2:** determining one or more consumer information elements required by input fields of a web page file displayed on a network device, the one or more consumer information elements being stored in an information account in a central data repository accessible via the distributed electronic network, the information account comprising a plurality of consumer information elements associated with a consumer and being subject to the consumer's control and management;<br><br>**1 or 2:** causing a browser to display a web page file that has been retrieved from a vendor server, the web page file including an instruction that causes the browser to request transmission of a client- side application having at least a temporary portion;<br><br>**4:** transmitting over the distributed electronic network from the network device a request for the determined one or more consumer information elements, the request including consumer authentication information and being made by the network device responsive to an input command supplied by the consumer;<br><br>**3:** prior to transmitting the request from the network device for the determined one or more consumer information elements, receiving and executing at the network device the client-side application configured to manage the request/response process for the network device;<br><br>**5:** filtering the one or more consumer information elements from the data including the one or more consumer information elements; and<br><br>**6:** autopopulating the filtered one or more consumer information elements into corresponding input fields of the web page file displayed on the network device. |

| Term | Agreed Construction |
|---|---|
| Sequence of steps in Claim 19 of the '806 Patent. | The steps must occur in the order indicated below:<br><br>A system for storing, managing, and distributing consumer information via a distributed electronic network comprising at least one processor programmed to execute a method comprising:<br><br>**1 or 2:** determining one or more consumer information elements required by input fields of a web page file displayed on a network device, the one or more consumer information elements being stored in an information account in a central data repository accessible via the distributed electronic network, the information account comprising a plurality of consumer information elements associated with a consumer and being subject to the consumer's control and management;<br><br>**1 or 2:** causing a browser to display a web page file that has been retrieved from a vendor server, the web page file including an instruction that causes the browser to request transmission of a client- side application having at least a temporary portion;<br><br>**4:** transmitting over the distributed electronic network from the network device a request for the determined one or more consumer information elements, the request including consumer authentication information and being made by the network device responsive to an input command supplied by the consumer;<br><br>**3:** prior to transmitting the request from the network device for the determined one or more consumer information elements, receive and execute at the network device the client-side application configured to manage the request/response process for the network device;<br><br>**5:** receiving at the network device in response to the request data including the one or more consumer information elements retrieved from the information account by filtering data from the information account and transmitted over the distributed electronic network to the network device;<br><br>**6:** filtering the one or more consumer information elements from the data including the one or more consumer information elements; and<br><br>**7:** autopopulating the filtered one or more consumer information elements into corresponding input fields of the web page file displayed on the network device. |

| Term | Agreed Construction |
|---|---|
| Sequence of steps in Claim 27 of the '806 Patent. | The steps must occur in the order indicated below: A method performed by a computing device having a processor and memory, comprising: **1 or 2:** determining by the processor one or more user information elements for fields of a web page, the one or more user information elements associated with an information account and in a data storage accessible via the distributed electronic network, the information account comprising a plurality of user information elements associated with a user and being subject to the user's control and management; **1 or 2:** causing a browser to display a web page file that has been retrieved from a vendor server, the web page file including an instruction that causes the browser to request transmission of a client- side application having at least a temporary portion; **3:** executing at the network device an application configured to manage a request/response process for the network device; **4:** transmitting over the distributed electronic network from the network device a request for the determined one or more user information elements the request including user authentication information and being made by the network device responsive to an input command supplied by the user; **5:** receiving at the network device the one or more user information elements filtered from the information account; and **6:** autopopulating the filtered one or more user information elements into corresponding fields. |

Having reviewed the intrinsic and extrinsic evidence of record, and as qualified above, the Court hereby adopts the parties' agreed constructions.

## IV.    CONSTRUCTION OF DISPUTED TERMS

### A.    "temporary portion" / "client-side application having at least a temporary portion"

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "temporary portion"[13]<br><br>• '806 Patent Claims 1, 11, 19, 27<br><br>"client-side application having at least a temporary portion"<br><br>• '806 Patent Claims 1, 11, 19, 27 | a portion of an application that is specific to the browser session only and removed from the client device memory after its execution | a portion of an application that is specific to the browser session only and removed from the client device after its execution |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

**The Parties' Positions**

Plaintiff submits: The temporary portion of the client-side application is temporary in that it is removed from the device memory rather than from the device generally. The Asserted Patents provide that the application "resides in temporary memory storage" of the device and that it "may be removed from the client device [] after its execution is complete." This temporary storage is distinct from permanent storage (such as a hard drive), and removal from permanent storage is not required by or disclosed in the patents. Dkt. No. 181 at 9–10.

In addition to the claims themselves, Plaintiff cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '875 Patent col.7 ll.55–58; '581 Patent col.7

---

[13] The term does not appear in the claims identified the parties' Joint Claim Construction Chart apart from "client-side application having at least a temporary portion." Dkt. No. 192-1 at 1.

ll.35–38; '806 Patent col.7 ll.22–25. **Extrinsic evidence**: Vijh Decl.[14] ¶ 90 (Plaintiff's Ex. D, Dkt. No. 181-5).

Defendants respond: The Asserted Patents teach that the application "may be removed from the device," not that it is simply removed from memory. This means the "temporary portion" is not permanently kept on the device in permanent storage. The patents also teach that the application is "specific to the browser session only and not the client device" and that, if the application is not removed from the device, it would be specific to the device. Dkt. No. 188 at 8–10.

In addition to the claims themselves, Defendants cite the following **intrinsic evidence** to support their position: '806 Patent col.1 ll.47–52, col.1 ll.63–67, col.3 ll.51–54, col.7 ll.22–27.

Plaintiff replies: The '806 Patent teaches that the application resides in temporary memory and "may" be removed from the device. That is, the application is not necessarily removed from the device. Further, it is not necessary to remove the application from permanent storage to make it specific to a browser session. Dkt. No. 189 at 6–7.

Plaintiff cites further **intrinsic evidence** to support its position: '806 Patent col.7 ll.22–27.

**<u>Analysis</u>**

The issue in dispute is whether the "temporary portion" of the client-side application is necessarily removed entirely from the device after its execution. It is not.

The '806 Patent does not equate a "temporary" client-side application with one that is necessarily entirely removed from the client device once execution of the application is complete. Rather, the patent indicates that the client-side application is temporary in that it resides in

---

[14] Declaration of Rahul Vijh Regarding Proposed Constructions and Definiteness of the Asserted Claims of U.S. Patent Nos. 7,016,875, 7,257,581, and 8,260,806 (May 9, 2019).

temporary memory. In addition, it may be (but need not be) removed entirely from the device after its execution is complete. Specifically, the patent provides:

> The client-side application 105 resides in ***temporary memory storage*** of the client device 104, such as cache memory or the like, and ***<u>may be</u> removed from the client device*** 104 after its execution is complete. The client-side application 105 is ***specific to the browser session*** only and not to the client device 104.

'806 Patent col.7 ll.22–27 (emphasis added). From this, the Court understands the removal of the client-side application from the device is permissive or exemplary. It is not definitional of a client-side application with a "temporary portion." This passage allows that the client-side application is not necessarily removed from the client device (it "may be" removed) even while stating the client-side application "is specific to the browser session." Thus, "specific to the browser session" does not mean the application is necessarily removed from the device. The defining feature of a temporary application (or portion of an application) is that it resides in temporary memory and is specific to the browser session only.

Accordingly, the Court determines that "temporary portion" does not need to be construed apart from "client-side application having at least a temporary portion" and construes "client-side application having at least a temporary portion" as follows:

- "client-side application having at least a temporary portion" means "client-side application having at least a portion that: (1) is specific to the browser session only and (2) resides in the client device's temporary memory storage."

### B. "processing module for processing" and "processing module"

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "processing module for processing" <br><br> • '581 Patent Claim 36 | plain and ordinary meaning | indefinite |
| "processing module [executed by the vendor server]" <br><br> • '806 Patent Claims 8, 18 | plain and ordinary meaning | indefinite |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

### The Parties' Positions

Plaintiff submits: The term "processing module" refers to code that is executed by a processing entity, such as a server. As recognized by Defendants' expert, the term "module" itself refers to "a collection of routines and data structures that performs a particular task." Dkt. No. 181 at 10–11.

In addition to the claims themselves, Plaintiff cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '581 Patent col.9 ll.18–20; '806 Patent col.8 ll.29–31. **Extrinsic evidence**: Vijh Decl. ¶¶ 31–34 (Plaintiff's Ex. D, Dkt. No. 181-5); Gray Decl.[15] ¶ 66 (Plaintiff's Ex. E, Dkt. No. 181-6).

Defendants respond: The term "processing module" does not itself denote any particular structure, it is a nonce phrase that is used in the claims to denote a structure by the function it performs. Specifically, the "processing module" of Claim 36 of the '581 is for processing the selected consumer information elements, and the "processing module" of Claims 8 and 18 of the

---

[15] Declaration of Stephen Gray (May 9, 2009).

'806 Patent is each for processing of the consumer information elements that is executed by the server. As such, "processing module" is governed by 35 U.S.C. § 112, ¶ 6. The Asserted Patents do not disclose any algorithm for the processing functions, and the patents therefore do not satisfy the structural-disclosure requirement of § 112, ¶ 6. Consequently, "processing module" renders the claims indefinite. Dkt. No. 188 at 10–13.

In addition to the claims themselves, Defendants cite the following **intrinsic evidence** to support their position: '581 Patent col.5 ll.45–49, col.8 l.59 – col.9 l.20, col.10 ll.38–54; '806 Patent col.5 ll.35–39, col.8 l.44 – col.9 l.4, col.10 ll.22–38.

Plaintiff replies: The "processing module" terms are part of methods in the claims and are not used to denote structure that performs a specific function. The methods involve passing information to the processing module, but the claims do not require that the processing module perform any specific function. As such, § 112, ¶ 6 does not apply. Dkt. No. 189 at 7–8.

### Analysis

There are two related issues in dispute. First, whether the "processing module" terms are governed by 35 U.S.C. § 112, ¶ 6. Second, if the terms are governed by § 112, ¶ 6, whether the Asserted Patents disclose the related structure required under the statute. The terms are not governed by § 112, ¶ 6.

To begin, the Court notes that the claims are directed to computer-implemented processes that manage and collect certain consumer information elements and then pass them on "for processing" without specifying any specific "processing." Specifically, each of the claims is expressly directed to "storing, managing, and distributing consumer information." '581 Patent col.22 ll.61–63 (Claim 36 preamble); '806 Patent col.17 ll.60–63 (Claim 1 preamble, Claim 8 ultimately depends from Claim 1), col.19 ll.51–52 (Claim 11 preamble, Claim 18 ultimately depends from Claim 11). The

"processing" recited in the claims is something that happens once the consumer information is passed on. For example, Claim 36 of the '581 Patent recites: "in response to receiving the selected consumer information elements from the host server, ~~passing~~ pass the selected consumer information elements to a processing module for processing." '581 Patent col.23 ll.13–16. This comports with the description of the invention, which generally provides "systems and methods for the storage, management, and delivery of user or consumer information." '581 Patent col.1 ll.19–22; '806 Patent col.1 ll.23–25. On delivery of the information to, e.g., a vendor, the vendor may "process the consumer information, *as needed*, by way of a processing module." '581 Patent col.9 ll.16–20 (emphasis added); '806 Patent col.10 ll.34–38. What specific processing is done by the processing module is irrelevant to the claims. Stated another way, the "processing module" is not limited to any specific processing function but is just general processing.

Defendants have not overcome the presumption against construing these terms under § 112, ¶ 6. There is a presumption against applying § 112, ¶ 6 to terms that lack the "means" language traditionally used to invoke the statue. This "presumption can be overcome and § 112, para. 6 will apply if the challenger demonstrates that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347–49 & n.3 (Fed. Cir. 2015) (en banc in relevant portion). The Federal Circuit has instructed that for computer-implemented functions that are "basic," the computer itself is definite structure for performing the function. *See, In re Katz Interactive Call Processing Patent Litigation*, 639 F.3d 1303, 1316 (Fed. Cir. 2011). *Katz* contrasted specific functions with general functions such as "processing, receiving, and storing" and held that "those [general] functions can be achieved by any general purpose computer without special programming" and the "functions of 'processing,' 'receiving,' and 'storing' are

coextensive with the structure disclosed, i.e., a general purpose processor." *Id.* (quotation marks omitted); *see also*, *EON Corp. IP Holdings LLC v. AT&T Mobility LLC*, 785 F.3d 616, 622 (Fed. Cir. 2015) (explaining that "'receiving' data, 'storing' data, and 'processing' data" functions are each coextensive with a microprocessor). Based on this precedent, the Court understands that the "processing module for processing" of the claims is inherently structural. As such, the presumption against applying § 112, ¶ 6 stands.

Accordingly, the Court determines that the terms are not governed by § 112, ¶ 6 and have their plain and ordinary meaning without the need for further construction.

### C. "application configured to manage a request/response process," "application configured to manage the request/response process," and "prior to transmitting the request from the network device for the determined one or more consumer information elements, receive and execute at the network device the client-side application configured to manage the request/response process for the network device"

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "application configured to manage a request/response process" <br><br>• '806 Patent Claims 1, 27 <br><br>"application configured to manage the request/response process" <br><br>• '806 Patent Claims 11, 19 | plain and ordinary meaning <br><br>Alternatively to the extent this term is governed by § 112, ¶ 6: <br>• **Function**: managing a request/response process <br>• **Structure**: a JAVA applet, as disclosed in specification. | indefinite <br><br>Alternatively, a JAVA applet, as disclosed in specification. |
| "prior to transmitting the request from the network device for the determined one or more consumer information elements, receive and execute at the network device the client-side application configured to manage the request/response process for the network device" <br><br>• '806 Patent Claim 19[16] | plain and ordinary meaning | indefinite |

---

[16] Only Claim 19 is identified in the 4-5(d) chart, but Claim 11 also includes this limitation.

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

**<u>The Parties' Positions</u>**

Plaintiff submits: These terms are not governed by 35 U.S.C. § 112, ¶ 6 as the claims themselves provide the structure for performing the "managing a request/response process" in the form of a two-step algorithm. Specifically, the claims recite transmitting from a network device a request for information and receiving at the network device the information filtered from an information account. Even if these terms are governed by § 112, ¶ 6, the '806 Patent describes structure for managing the request/response process with reference to Figures 5 and 6, including a JAVA applet. Dkt. No. 181 at 11–14.

In addition to the claims themselves, Plaintiff cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '806 Patent figs.5, 6, col.5 ll.31–35, col.7 ll.17–22, col.7 ll.55–56, col.13 l.42 – col.17 l.44. **Extrinsic evidence**: Vijh Decl. ¶¶ 35–41 (Plaintiff's Ex. D, Dkt. No. 181-5).

Defendants respond: The phrase "application configured to" is a nonce phrase equivalent to "means for" and the claims do not otherwise provide structure for performing the "manage a request/response process"; therefore, the terms are governed by § 112, ¶ 6. The transmitting and receiving steps in the claims are distinct from the managing function of the application-configured-to terms and thus do not provide structuring to "manage a request/response process." Further, the patent does not provide any algorithm for managing the request/response process. Figures 5 and 6 are directed to managing communication rather than the request/response process. The only disclosed structure possibly linked to the claim language is a JAVA applet. Dkt. No. 188 at 13–17.

In addition to the claims themselves, Defendants cite the following intrinsic and extrinsic evidence to support their position: **Intrinsic evidence**: '806 Patent figs.5, 6, col.2 ll.38–54, col.7 ll.17–20, col.13 ll.48–50, col.15 ll.43–45. **Extrinsic evidence**: Vijh Decl. ¶¶ 23, 27, 37–40 (Plaintiff's Ex. D, Dkt. No. 181-5); Gray Decl. ¶ 34 (Plaintiff's Ex. E, Dkt. No. 181-6).

Plaintiff replies: "In order to narrow the disputes before the Court, and without conceding Defendants' proposed construction is necessary or correct, CXT agrees that the relevant structure is the disclosed JAVA applet (and equivalents thereof) performing the 'managing a request/response process.'" Dkt. No. 189 at 8.

### <u>Analysis</u>

There are two related issues in dispute. First, whether the "application configured to …" terms are governed by 35 U.S.C. § 112, ¶ 6. Second, if the terms are governed by § 112, ¶ 6, whether the '806 Patent discloses the related structure required under the statute. The terms are governed by § 112, ¶ 6, and the patent satisfies the structural-disclosure requirement of the statute. At the hearing, the parties agreed to the Court's construction set forth below.

Defendants have overcome the presumption against construing these terms under § 112, ¶ 6. As stated above, "the presumption [against applying § 112, ¶ 6] can be overcome and § 112, para. 6 will apply if the challenger demonstrates that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Williamson*, 792 F.3d at 1347–49 & n.3. In the context of a computer-implemented functionally-delineated limitation involving other than a "basic" computer function, as is the case here, the Court looks to whether the claim recites the "objectives and operations" of the limitation such that the structure is apparent from the claim language. *See, e.g.*, *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1319–21 (Fed. Cir. 2004) ("circuit [for performing a function]" found to be

sufficiently definite structure because the claim recited the "objectives and operations" of the circuit); *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1295, 1298–99, 1301 (Fed. Cir. 2014) (finding "heuristic [for performing a function]" to be sufficiently definite structure because the patent described the operation and objectives of the heuristic). Here, there is no claim recitation of the objective or operation of the application. Specifically, the "transmitting" and "receiving" operations in the claims are not tied to the application but rather appear to be distinct operations. And it is not clear what are the application's inputs and outputs. Ultimately, the structural nature of the application is defined solely by the claim-recited function it performs, and that is only understood with reference to the described embodiments. This invokes § 112, ¶ 6. *See TriMed, Inc. v. Stryker Corp.*, 514 F.3d 1256, 1259 (Fed. Cir. 2008) ("Sufficient structure exists [to avoid § 112, ¶ 6] when the claim language specifies the exact structure that performs the functions in question without need to resort to other portions of the specification or extrinsic evidence for an adequate understanding of the structure.")

Accordingly, the Court determines that "prior to transmitting the request from the network device for the determined one or more consumer information elements, receive and execute at the network device the client-side application configured to manage the request/response process for the network device" does not need to be construed apart from "application configured to manage the request response process" and that the application-configured-to terms are governed by § 112, ¶ 6 with constructions as follows:

- "application configured to manage a request/response process":

  - **function**: managing a request/response process

  - **structure**: a JAVA applet, as disclosed in specification, and equivalents thereof; and

- "application configured to manage the request/response process":

  o **function**: managing the request/response process

  o **structure**: a JAVA applet, as disclosed in specification, and equivalents thereof.

**D.** **"server-side application for interacting with the central repository," "server-side application for interacting with a database management system," and "server-side application configured for communication with a host server that hosts a central data repository"**

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "server-side application for interacting with the central repository"<br>• '806 Patent Claim 6 | plain and ordinary meaning<br><br>Alternatively to the extent this term is governed by § 112, ¶ 6<br>• **Function**: interacting with the central data repository<br>• **Structure**: network server 108 implementing the algorithm of Figs. 5, 6, and 7 including steps 510, 520, 536, 544, and corresponding portion of the specifications. | indefinite |
| "server-side application for interacting with a database management system"<br>• '806 Patent Claim 16 | plain and ordinary meaning<br><br>Alternatively to the extent this term is governed by § 112, ¶ 6<br>• **Function**: interacting with a database management system<br>• **Structure**: network server 108 implementing the algorithm Figs. 5, 6, and 7 including steps 510, 520 536, 544, 626, 634, and corresponding portion of the specifications. | indefinite |

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "server-side application configured for communication with a host server that hosts a central data repository"<br><br>• '581 Patent Claim 36[17] | | indefinite |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

**The Parties' Positions**

Plaintiff submits: These terms do not use the "means for" language used to invoke 35 U.S.C. § 112, ¶ 6, and the claims provide sufficient structure to perform the recited functions; therefore, § 112, ¶ 6 does not apply. If governed by § 112, ¶ 6, the structure for "interacting with the central data depository" and "interacting with a database management system" is provided in Figures 5, 6, and 7 of the '581 and '806 Patents. Dkt. No. 181 at 14–16.

In addition to the claims themselves, Plaintiff cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '581 Patent col.2 ll.58–61, col.8 ll.7–24, col.10 ll.25–37, col.14 ll.3–7; '806 Patent figs.5–7, col.2 ll.56–59, col.5 ll.31–35, col.7 l.55 – col. 8 l.29, col.10 ll.9–21, col.15 ll.45–50. **Extrinsic evidence**: Vijh Decl. ¶¶ 44–46, 51–54 (Plaintiff's Ex. D, Dkt. No. 181-5).

---

[17] This term was not identified by the parties in their Joint Claim Construction Chart or in their briefs. At the hearing, Defendants represented that this term was inadvertently omitted from the chart and briefing and that this term should be construed similarly to the server-side-application terms from Claims 6 and 16 of the '806 Patent. That is, Defendants, while offering no argument or evidence directly on point, nevertheless ask the Court to hold Claim 36 of the '581 Patent invalid as indefinite because of the server-side-application term. However, the Court concludes that Defendants have not shown that this term or the other related terms are indefinite, so the Court will provide a construction for this term.

Defendants respond: The phrase "server-side application" is a nonce phrase equivalent to "means," and the claims do not otherwise provide structure for performing the "interacting with the central depository" or "interacting with a database management system" functions; therefore, the terms are governed by § 112, ¶ 6. The Asserted Patents do not provide any algorithm for performing these functions. Figures 5 through 7 are directed to managing communication between a client-side application and the database management system and are not directed to a server-side application. Dkt. No. 188 at 17–20.

In addition to the claims themselves, Defendants cite the following **intrinsic evidence** to support their position: '806 Patent figs.5–7, col.15 ll.45–50.

Plaintiff replies: As set forth in the unrebutted testimony of Plaintiff's expert, the Asserted Patents provide algorithms sufficient to perform the recited functions. As further explained by the expert, one of ordinary skill in the art would understand the differences between the client-side and server-side applications and would therefore be "enabled to determine the relevant algorithm for a server-side application based on the disclosure for a client-side application." Dkt. No. 189 at 8–9.

Plaintiff cites further **extrinsic evidence** to support its position: Vijh Decl. ¶¶ 42–54 (Plaintiff's Ex. D, Dkt. No. 181-5).

### <u>Analysis</u>

There are two related issues in dispute. First, whether the "server-side application for …" terms are governed by § 112, ¶ 6. Second, if the terms are governed by § 112, ¶ 6, whether the Asserted Patents disclose the related structure required under the statute. The terms are governed by § 112, ¶ 6 and sufficient structure is disclosed.

Defendants have overcome the presumption against construing these terms under § 112, ¶ 6. As stated above, "the presumption [against applying § 112, ¶ 6] can be overcome and § 112, para. 6 will apply if the challenger demonstrates that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Williamson*, 792 F.3d at 1347–49 & n.3. Also as stated above, in the context of a computer-implemented functionally-delineated limitation involving other than a "basic" computer function, as is the case here, the Court looks to whether the claim recites the "objectives and operations" of the limitation such that the structure is apparent from the claim language. Here, there is no claim recitation of the objective or operation of the server-side application, and it is not clear what are the application's inputs and outputs. Ultimately, as with the application-configured-to limitations analyzed above, the structural nature of the server-side application is defined solely by the claim-recited function it performs, and that is only understood with reference to the described embodiments. This invokes § 112, ¶ 6.

The Court is not persuaded that the Asserted Patents fail to provide structure for the server-side application simply because the algorithm identified by Plaintiff is directed to a client-side application, as Defendants posit. To begin, there does not appear to be any dispute regarding whether Figures 5, 6, and 7, and accompanying description, disclose an algorithm for performing the recited "interacting" and "communication" functions for a client-side application. The issue then distills to whether the disclosure of the details of the client-side application is a sufficient disclosure of structure for a server-side application. The patents provide the detail of a client-side application and note: "Alternative embodiments employing a server-side application 107 instead of the client-side application 105 have been discussed above. Those skilled in the art will appreciate the differences between the interactions involving a client-side application 105 and a

server-side application 107." '581 Patent col.14 ll.3–7; '806 Patent col.13 ll.50–55; *see also*, '581 Patent col.16 ll.2–7; '806 Patent col.15 ll.45–50. Thus, the patents link the claimed server-side application (and its functions) to the disclosed details (and algorithm) of the client-side application and note that the differences in implementation would be appreciated, or understood, by one of ordinary skill in the art. This is sufficient to satisfy the disclosure requirements of § 112, ¶ 6. *See Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1385 (Fed. Cir. 2011) (holding that to satisfy the disclosure requirement of the statute, "the patent need only disclose sufficient structure for a person of skill in the field to provide an operative software program for the specified function").

Accordingly, that Court determines that these terms are governed by § 112, ¶ 6 with constructions as follows.

- "server-side application for interacting with the central repository":

    o **function**: interacting with the central repository

    o **structure**: network server 108 implementing the algorithm of Figs. 5, 6, and 7 including steps 510, 520 536, 544, 626, 634, and corresponding portion of the specifications, and equivalents thereof;

- "server-side application for interacting with a database management system":

    o **function**: interacting with a database management system

    o **structure**: network server 108 implementing the algorithm of Figs. 5, 6, and 7 including steps 510, 520 536, 544, 626, 634, and corresponding portion of the specifications, and equivalents thereof; and

- "server-side application configured for communication with a host server that hosts a central data repository":

- o **function**: communication with a host server that hosts a central data repository

- o **structure**: network server 108 implementing the algorithm of Figs. 5, 6, and 7 including steps 510, 520 536, 544, 626, 634, and corresponding portion of the specifications, and equivalents thereof.

E.      **"single sign-on mechanism"**

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "in response to authenticating the consumer, invoking a single sign-on mechanism so that the consumer will not be required to resubmit the consumer authentication information upon accessing a subsequent web page file prior to expiration of a timeout period" [18] <br><br> • '581 Patent Claim 43 | | |
| "single sign-on mechanism" [19] <br><br> • '581 Patent Claims 2, 43 | a mechanism that allows the consumer to provide authentication information to access his information account at only a first website, and then automatically reauthenticates the consumer at subsequent websites | a mechanism that allows the consumer to provide authentication information to access his information account at only a first website, and then uses applet technology to automatically reauthenticate the consumer at subsequent websites |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

---

[18] The parties' Joint Claim Construction Chart does not list a construction for this apart from "single sign-on mechanism." Dkt. No. 192-1 at 3.

[19] The parties' Joint Claim Construction Chart lists "single sign-on [mechanism / feature / function]" but the identified claims have only the "mechanism" variant. Dkt. No. 192-1 at 3.

**The Parties' Positions**

Plaintiff submits: The dispute here is whether the "single sign-on mechanism" should be limited to the "applet technology" of a described embodiment. It should not. The '581 Patent states that the applets are exemplary rather than limiting. Dkt. No. 181 at 16–17.

In addition to the claims themselves, Plaintiff cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '875 Patent col.7 ll.30–35, col.7 ll.53–55, col.22 ll.50–55. **Extrinsic evidence**: Vijh Decl. ¶¶ 66–71 (Plaintiff's Ex. D, Dkt. No. 181-5).

Defendants respond: The "single sign-on mechanism" is defined and limited to "the use of applet technology" through U.S. Provisional Application No. 60/238,847, which is incorporated into the '581 Patent. Dkt. No. 188 at 20–22.

In addition to the claims themselves, Defendants cite the following **intrinsic evidence** to support their position: '581 Patent col.7 ll.4–9; U.S. Provisional Application No. 60/238,847 at 3, 6–8 (Defendants' Ex. 1, Dkt. No.188-1 at 5, 8-10) (the "'847 Provisional Application").

Plaintiff replies: The '581 Patent provides "any other type of client-side application may be used without departing from the spirit and scope of the present invention." The '847 Provisional Application is one of five different provisional applications incorporated into the '581 Patent. Thus, statements from '847 Provisional Application that are not in the '581 Patent do not limit the invention to the applet technology. Dkt. No. 189 at 9–10.

**Analysis**

The issue in dispute is whether the single sign-on mechanism of the '581 Patent is limited to "applet technology." It is not.

The single sign-on mechanism is not defined in the '581 Patent as Defendants suggest. To begin, the '847 Provisional Application provides: "Those skilled in the art should appreciate that

the single sign-on method of the present invention *may be* implemented using one or more applets." '847 Provisional Application at 8 (emphasis added), Dkt. No. 188-1 at 10. This alone suggests that an applet implementation is exemplary or permissive, not necessary. Further, the Asserted Patents, although they incorporate the '847 Provisional Application, do not include the passage identified by Defendants that is ostensibly definitional of the invention. Specifically, Defendants rely on the following passage from the '847 Provisional Application:

> The present invention provides a single sign-on mechanism that allows the consumer to "sign-on" (provide username and password) for authentication to access his PASS 110 at only a first web-site. The authentication status may then "follow" the consumer as the consumer accesses subsequent web-sites. At such subsequent web-sites, a consumer who has activated the single sign-on mechanism will not be asked to re-authenticate himself. Reauthentication will be performed automatically through the use of applet technology.

'847 Provisional Application at 6, Dkt. No. 188-1 at 8. This passage does not appear in the Asserted Patents. The Federal Circuit has instructed that deleting ostensibly limiting language from a provisional application when converting it to a nonprovisional application signals an intent to not be limited by the language of the provisional. *MPHJ Tech. Invs., LLC v. Ricoh Ams. Corp.*, 847 F.3d 1363, 1368–69 (Fed. Cir. 2017) ("We conclude that a person of skill in this field would deem the removal of these limiting clauses [in the provisional application] to be significant. The [patent] in its final form contains no statement or suggestion of an intent to limit the claims to the deleted [clauses].").[20] Thus, the deletion of the ostensibly limiting language from the '847 Provisional Application suggests an intent to not be so limited.

_____

[20] At the hearing, Defendants argued that *MPHJ* is distinguishable in that it was applying the broadest-reasonable-interpretation standard used by the Patent and Trademark Office ("PTO") when reexamining patents. Defendants have not, however, provided any distinction between the broadest-reasonable-interpretation standard and the standard employed by the courts in litigation with respect to lexicography. Indeed, the Federal Circuit equates the broadest-reasonable-interpretation and litigation standards for lexicography. *See, e.g., Facebook, Inc. v. Pragmatus AV, LLC*, 582 F. App'x 864, 866, 868 (Fed. Cir. 2014) (applying *Phillips* and *GE Lighting*, cited in the

Here, the issued patents further include language suggesting that an applet implementation is exemplary, not mandatory. For instance, the patent links the single sign-on mechanism to a client-side application and notes that the client-side application is not limited to any particular implementation:

> In one embodiment of the present invention, a single sign-on mechanism may be provided to allow a consumer to "sign-on" (provide username and password, etc.) for authentication to access an information account 110 at only a first website. The authentication status may then "follow" the consumer as the consumer accesses subsequent websites. At such subsequent websites, a consumer who has activated the single sign-on mechanism will not be asked to re-authenticate himself. For example, the host server 108 may maintain an authentication table (not shown) that records the consumer authentication information, the sign-on time and a browser identifier. When the consumer accesses a subsequent website that requires sign-on for accessing the information account 110, the client-side application 105 may communicate the browser identifier to the host server 108. The host server 108 may use the browser identifier to look up the consumer authentication information and previous sign-on time in the authentication table. The previous sign-on time may be compared to the current time in order to determine whether a time-out interval has expire. If the time-out interval has not expired, the host server 108 may acknowledge that the consumer is authenticated.

> A web page file 116 displayed by the browser 112 may include input fields for the input of consumer information. The web page file 116 may also include an instruction (e.g., a "call") that causes the browser 112 to download and execute a client-side application 105. *JAVA applets are well known client-side applications* and are particularly suited for use in various embodiments due to their platform-independent nature. *However, any other type of client-side application may be used without departing from the spirit and scope of the present invention*.

'581 Patent col. 7 ll.4–35 (emphasis added). In summary, the '847 Provisional Application teaches that the "present invention *may be* implemented using one or more applets," and the '581 Patent teaches that "*any other type* of client-side application may be used without departing from the spirit and scope of the present invention." The '581 Patent, even considering statements from the

---

Legal Principles section above, to determine if the patentee acted as a lexicographer under the broadest reasonable interpretation standard).

'847 Provisional Application, does not define the "single sign-on mechanism" as Defendants' suggest.

Accordingly, the Court determines that "in response to authenticating the consumer, invoking a single sign-on mechanism so that the consumer will not be required to resubmit the consumer authentication information upon accessing a subsequent web page file prior to expiration of a timeout period" does not need to be construed apart from "single sign-on mechanism" and construes "single sign-on mechanism" as follows:

- "single sign-on mechanism" means "a mechanism that allows the consumer to provide authentication information to access his information account at only a first website, and then automatically reauthenticates the consumer at subsequent websites."

**F.** **"automatically managing subsequent authentications of the consumer with the database management system so that the consumer will not be required to again input the consumer authentication information"**

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "automatically managing subsequent authentications of the consumer with the database management system so that the consumer will not be required to again input the consumer authentication information"<br>• '875 Patent Claim 1 | automatically managing subsequent authentications of the consumer with the database management system, which is at the host server, so that the consumer will not be required to again input the consumer authentication information | automatically managing subsequent authentications of the consumer with the database management system at the host server so that the consumer will not be required to again input the consumer authentication information |

<u>**The Parties' Positions**</u>

Plaintiff submits: The dispute here is whether the subsequent authentications should be limited to authentications performed at the host server, as in a described embodiment. The '875 Patent states that host-server authentication is exemplary rather than limiting. Dkt. No. 181 at 18–19.

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '875 Patent col.23 l.62 – col.24 l.7; '875 Patent File Wrapper July 5, 2005 Response at 11 (Plaintiff's Ex. F, Dkt. No. 181-7 at 12).

Defendants respond: The '875 Patent defines and limits the data base management system as located at the host server. While the patent discloses that an "authentication table" may be located other than at the host server, the "authentication table" is not recited in this term. "While other embodiments (involving, for example, an 'authentication table') may possibly involve other locations, authentications with the 'database management system' must occur at the 'host server.'" Dkt. No. 188 at 22–25.

In addition to the claims themselves, Defendants cite the following **intrinsic evidence** to support their position: '875 Patent fig.11, col.4 ll.12–14, col.7 ll.65–67, col.8 ll.65–66, col.10 l.64 – col.11 l.2, col.22 ll.60–61, col.23 l.62 – col.24 l.7, col.24 ll.32–35.

Plaintiff replies: The '875 Patent discloses that an authentication table located other than at the host server may be used by the database management system for the recited authentication. This means that even if the database management system is necessarily located at the host server, the authentication process does not proceed exclusively at the host server. Dkt. No. 189 at 10.

<u>**Analysis**</u>

The issue in dispute is whether subsequent authentications with the database management system necessarily occur at the host server. The parties agree that the "database management system" is "at the host server." To the extent that Defendant contends all aspects of the subsequent authentications with the database management system must occur at the host sever, the Court disagrees.

The subsequent authentications are not necessarily limited to the host server. There is no dispute that authentications with the database management system may include use of an authentication table that is accessible to the host server but is stored at a location other than the host server. Indeed, in this regard, the '875 Patent provides:

> At step 1106 the consumer authentication information, the browser identifier, the sign-on time and any other information associated with the sign-on process are stored in an authentication table 113, which is preferably maintained at the host server 108. Accordingly, the client-side application 105 may transmit the consumer authentication information, the browser identifier, the sign-on time, etc. to the host server 108. The host server 108 may utilize the database management system 109 for interacting with the authentication table 113. ***The authentication table 113 may alternatively be stored in another location accessible by the host server*** 108, such as the data repository 102, or another network server. Once authenticated, the consumer can access the information account 110 via the vendor web-site 114 using the client device 104.

'875 Patent col.23 l.62 – col.24 l.9 (emphasis added). And Claim 13, which depends from Claim 1, recites "wherein ***automatically managing subsequent authentications of the consumer comprises recording in the authentication table*** in association with the consumer authentication information and the first-determined equipment identifier an indication that a single sign-on feature is activated." *Id*. at col.28 ll.25–36 (emphasis added). Thus, Claim 13 expressly states the "automatically managing subsequent authentications" may comprise recording information in a table the patent teaches may be at a location other than the host server. That is, even if the database management system is located at the host server, "automatically managing subsequent authentications … with the database management system" is not limited to the host server.

Accordingly, the Court construes this term as follows:

- "automatically managing subsequent authentications of the consumer with the database management system so that the consumer will not be required to again input the consumer authentication information" means "automatically managing subsequent authentications of the consumer with the database management

system, which is at the host server, so that the consumer will not be required to again input the consumer authentication information."

G. **"retrieving one or more consumer information element from the information account by filtering data from the information account" and "retrieving the selected consumer information elements . . . by filtering data from the information account with the database management system"**

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "retrieving one or more consumer information element from the information account by filtering data from the information account"<br><br>• '875 Patent Claim 1 | plain and ordinary meaning | retrieving the selected consumer information by filtering data from the information account based on vendor authentication information with the database management system |
| "retrieving the selected consumer information elements . . . by filtering data from the information account with the database management system"<br><br>• '581 Patent Claims 1, 24, 82 | plain and ordinary meaning | |
| "retrieve the selected consumer information elements . . . by filtering data from the information account with the database management system"<br><br>• '581 Patent Claims 36, 58[21] | | |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

---

[21] The parties' Joint Claim Construction Chart lists Claims 36 and 58 with the "retrieving . . ." limitation for the '581 Patent, but these claims do not have the "retrieving" language, instead they have "retrieve . . . ." Dkt. No. 192-1 at 4.

### The Parties' Positions

Plaintiff submits: The dispute here is whether the recited filtering should be limited to filtering performed based on vendor authentication information, as in a described embodiment. The '875 and '581 Patents disclose that vendor-authentication-information-based filtering is exemplary rather than limiting. Dkt. No. 181 at 19–21.

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '875 Patent col.4 l.67 – col.5 l.4, col.5 ll.15–18, col.10 ll.49–53, col.18 ll.4–8; '581 Patent col.4 ll.24–29, col.4 ll.40–44, col.10 ll.30–34, col.17 ll.47–51.

Defendants respond: A "plain and ordinary meaning" construction of this term would improperly read on matter disavowed during prosecution of the '581 Patent. Specifically, in response to rejections over two U.S. Patents, No. 6,385,596 ("*Wiser*") and No. 6,005,939 ("*Fortenberry*"), the patentee amended the claims to add the filtering limitation and argued that *Fortenberry* does not disclose filtering but rather just passes all the information. *Fortenberry*, while it does not use the term "filtering," discloses selectively passing information based on criteria, which falls within the scope of the ordinary meaning of "filtering" as used in the art. Thus, by distinguishing *Fortenberry* as not disclosing filtering, the patentee disavowed the full scope of filtering and limited the claimed filtering to the described filtering that uses vendor authentication information. Dkt. No. 188 at 25–30.

In addition to the claims themselves, Defendants cite the following intrinsic and extrinsic evidence to support their position: **Intrinsic evidence**: '581 Patent figs.5, 7, col.14 ll.33–41, col.14 l.64 – col.5 l.3, col.17 ll.34–41; '581 Patent File Wrapper July 12, 2004 Office Action at 4, 7 (Defendants' Ex. 4, Dkt. No. 188-4 at 6, 9), November 11, 2004 Response at 3, 9, 14, 17, 19, 24, 37–39 (Defendants' Ex. 4, Dkt. No. 188-4 at 14, 20, 25, 28, 30, 35, 48–50), April 12, 2007 Notice

of Allowance at 8 (Defendants' Ex. 4, Dkt. No. 188-4 at 70), U.S. Patent No. 6,385,596 (Defendants' Ex. 2, Dkt. No. 188-2) ("*Wiser*"), U.S. Patent No. 6,005,939 (Defendants' Ex. 3, Dkt. No. 188-3) ("*Fortenberry*"). **Extrinsic evidence**: Gray Decl. ¶¶ 36–37 (Plaintiff's Ex. E, Dkt. No. 181-6); *Microsoft Computer Dictionary* (4th ed. 1999)[22].

Plaintiff replies: During prosecution, the patentee distinguished *Fortenberry* based on the combination of limitations rather than just filtering. Dkt. No. 189 at 11.

<u>**Analysis**</u>

The issue in dispute is whether the patentee disavowed all filtering other than filtering "based on vendor authentication information with the database management system." It did not.

The Court does not find the disclaimer Defendants contend. During prosecution, the patentee distinguished the *Fortenberry* reference on the grounds that *Fortenberry* did not teach "filtering data from the information account with the database management system" but rather passed on information based on a security level. Specifically, when the patentee amended the claim to add "filtering data from the information account with the database management system" (among other limitations), it explained:

> The web site 210 receives the encrypted user information (i.e. the passport) from passport agent 216 and unlocks the message using the public key provided by the user 208. If the web site 210 is unable to unlock any of the environment variables in the passport, the request is ignored. The user 208 can provide to web site 210 one of several public keys which allow web site 210 to unlock data having one of several security levels. See Fortenberry reference, column 6, lines 31-38.

> With this passport system of the Fortenberry reference, a user 208 can ask the passport agent 216 to release specific information to a website 210. Opposite to the invention described in amended independent Claim 1, the passport agent 216 of the Fortenberry reference does not perform any filtering. The passport agent 216 *merely passes all of the information* to the website 210. The amount of access that the website 210 has to the information provided by the passport agent 216 is *based on the security level or type of public key* provided by the user 208. One public key

---

[22] This was not submitted as an exhibit.

> provided by the user 208 may provide complete access to the information while another public key will allow only a limited amount of access to the information.

'581 Patent File Wrapper November 11, 2004 Response at 37 (emphasis added), Dkt. No. 188-4 at 48. From this, the Court understands the patentee may have contrasted filtering information based on a security level with passing all the information available to a particular security level. That is, the patentee appears to have characterized *Fortenberry* as teaching passing the set of information associated with a security level as opposed to transforming data to create the set of information associated with the security. The argued distinction could be that *Fortenberry* teaches passing a preformed set of information and does not teach filtering data to form the set to pass. Ultimately, the patentee's argument should not be read as a clear and unmistakable disavowal of the scope of "filtering" beyond the narrow "filtering data from the information account based on vendor authentication information with the database management system" proposed by Defendants. *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013) ("Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable.").

The extent to which the patentee (and the patent examiner) mischaracterized *Fortenberry*, if at all, by stating it does not teach "filtering data from the information account with the database management system" is an issue of validity, not of claim scope.

Accordingly, the Court rejects Defendants' proposed "based on vendor authentication information with the database management system" limitation and determines these terms have their plain and ordinary meanings without the need for further construction.

### H. "database management system"

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "database management system"<br>• '875 Patent Claims 1, 27<br>• '581 Patent Claims 1, 24, 36, 58, 82<br>• '806 Patent Claim 16 | plain and ordinary meaning | system software hosted on the host server for storing and accessing information on the central data repository |

**The Parties' Positions**

Plaintiff submits: The meaning of "database management system" ("DBMS") is readily apparent from context and the term does not need to be construed. It plainly refers to "software for storing and accessing information in a database." Specifically, a DBMS is not necessarily "hosted on the host server." Some claims recite a host server and others do not. Further, Figure 5 of the '581 Patent depicts the host server and database management system as separate structures. Nor does a DBMS necessarily access "information on the central data depository." Again, some claims recite the central data depository and others do not (e.g., '581 Patent Claim 78). Dkt. No. 181 at 21–24.

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '581 Patent fig.5, col.2 ll.13–15, col.2 ll.58–65.

Defendants respond: The term needs to be construed to clarify that the DBMS is system software, that the DBMS is located on the host server, and that the DBMS stores and accesses information on a central data repository. The Asserted Patents define that the DBMS is located at the host server and "do not disclose any other location" for a DBMS. Figure 5 of the '581 Patent does not depict the DBMS and host server as in separate locations. Rather, it depicts the interaction between the components. Finally, the patents do not disclose the DBMS storing and accessing information in any database other than the central data depository. Dkt. No. 188 at 30–33.

In addition to the claims themselves, Defendants cite the following **intrinsic evidence** to support their position: '875 Patent, at [57]; '581 Patent, at [57], figs.1, 5, col.2 ll.13–15, col.2 ll.57–61, col.3 ll.27–28, col.7 l.4, col.7 ll.43–47; '806 Patent, at [57], fig.1, col.2 ll.12–13, col.2 ll.55–59, col.6 l.58, col.7 ll.29–33; '847 Provisional Application (Defendants' Ex. 1, Dkt. No.188-4).

Plaintiff replies: Defendants' proposed construction improperly imports limitations from the embodiments. Dkt. No. 189 at 12.

<u>**Analysis**</u>

There are two issues in dispute. First, whether the database management system is necessarily hosted on the host server. It is not. Second, whether the database management system necessarily stores and accesses information on a "central data depository." It does not.

The Court rejects Defendants' proposal to inject "host server" and "central data repository" into all claims when some claims expressly recite these limitations and others do not. Specifically, Defendants have not identified any intrinsic evidence that rises to the level of lexicography or disavowal to justify reading in the proposed limitations. Even if the Asserted Patents "do not disclose any other location for the 'database management system,'" Dkt. No. 188 at 31, this is not sufficient reason to require the database management system be hosted on the host server, especially when some claims recite a host server and others do not. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (en banc) ("we have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment"); *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012) ("It is likewise not enough that the only embodiments, or all of the embodiments, contain a particular limitation. We do not read limitations from the specification into claims; we do not redefine words. Only the patentee can do that."); *SRI Int'l v. Matsushita Elec. Corp.*, 775

F.2d 1107, 1122 (Fed. Cir. 1985) (en banc) ("It is settled law that when a patent claim does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim in determining either validity or infringement."). Similarly, even if "the only relevant 'database' disclosed by the patents is the 'central data repository,'" Dkt. No. 188 at 32, this is not a redefinition of "database management system" that limits the databases it can manage to the "central data repository," especially when some claims recite "central data repository" and others do not.

Accordingly, the Court construes "database management system" as follows:

- "database management system" means "software for storing and accessing information in a database."

**I.** **"web-site," "website," "web site," and "subsequent website"**

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "web-site" <br>• '875 Patent Claims 1, 17, 27 | plain and ordinary meaning | a group of related web pages associated with a single domain name, including any of its subdomains |
| "website"[23] <br>• '875 Patent Claim 17 | | |
| "web site" <br>• '875 Patent[24] | | |
| "subsequent website" <br>• '875 Patent Claim 17 | plain and ordinary meaning | a group of webpages associated [with] a domain name that is different from the initial domain name, including any of its subdomains |
| "subsequent web-site"[25] <br>• '875 Patent Claims 1, 27 | | |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

**The Parties' Positions**

Plaintiff submits: Under the plain meaning of "website," a single domain may host multiple websites, including any subsequent website. For example, the pages at taxonomist.tripod.com may constitute a website that is distinct from the pages at malawi.tripod.com, even though of the same domain (tripod.com). Dkt. No. 181 at 27–30.

---

[23] This term does not appear in the claims identified in the Joint Claim Construction Chart other than as part of "subsequent website." Dkt. No. 192-1 at 5.

[24] This term does not appear in the claims identified in the Joint Claim Construction Chart. Dkt. No. 192-1 at 5.

[25] The Joint Claim Construction Chart lists "subsequent website" as in Claims 1, 17, and 27, but the term does not appear in Claims 1 or 27, which instead recite "subsequent web-site." Dkt. No. 192-1 at 5.

In addition to the claims themselves, Plaintiff cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '875 Patent col.22 ll.30–38. **Extrinsic evidence**: Vijh Decl. ¶¶ 77–82 (Plaintiff's Ex. D, Dkt. No. 181-5).

Defendants respond: The '875 Patent "consistently describes a particular 'website' with reference to the vendor that operates the website"; therefore, a website is associated with a single domain name. For example, the pages at www.business.com and those at m.business.com together form a single website. Further, there is nothing in the patent to suggest that separate authentication for a subsequent website would be necessary if it were associated with the same domain name as the initial website accessed. Claim 1 of the '875 Patent recites authenticating a user for a first website and then interacting with a subsequent website "that is configured to provide access to the information account upon authentication of the user." This indicates that the subsequent website is associated with a different domain name than the first website. Dkt. No. 188 at 33–36.

In addition to the claims themselves, Defendants cite the following intrinsic and extrinsic evidence to support their position: **Intrinsic evidence**: '875 Patent fig.9, col.1 ll.45–49, col.2. ll.15–17, col.2 ll.52–60, col.6 ll.40–43, col.15 ll.36–37, col.22 ll.34–37, col.24 ll.7–14, col.25 ll.63–67. **Extrinsic evidence**: Vijh Decl. ¶¶ 77–82 (Plaintiff's Ex. D, Dkt. No. 181-5).

Plaintiff replies: As shown by Plaintiff's expert, it was known at the relevant time period that a single domain could host multiple websites. Defendants did not address the evidence. Further, the '875 Patent disclosures relied upon by Defendants do not discuss "domain" at all. Dkt. No. 189 at 12.

### Analysis

The issue in dispute distills to whether all the webpages associated with a domain, including any of its subdomains, necessarily constitute a single website. They do not.

The Court is not persuaded by Defendants' argument that all pages associated with a domain, including any subdomains, necessarily constitute a single website. For example, the Court understands that under Defendants' position, all pages under the www.uscourts.gov domain and its subdomains constitute a single website. This means that under Defendants' construction www.txed.uscourts.gov (the website for the U.S. District Court for the Eastern District of Texas), www.cand.uscourts.gov (the website for the U.S. District Court for the Northern District of California), and www.cafc.uscourts.gov (the website for the U.S. Court of Appeals for the Federal Circuit) all constitute a single website. The intrinsic record does not establish lexicography or disavowal to define a website as Defendants propose. Rather, "website" is used according to its customary meaning. According to Defendants' expert witness and the *Microsoft Computer Dictionary* (4th ed. 1999) this customary meaning is a "group of related HTML documents and associated files, scripts, and databases that is served up by an HTTP server on the World Wide Web." Gray Decl. ¶ 86, Dkt. No. 181-6 at 38. That is, a website is a collection of related HTML documents, and any files, scripts, and databases associated with the collection, that is served up by an HTTP server on the World Wide Web.

With respect to "subsequent website," the Court agrees with Defendants that the "subsequent" website is different from the initial website. This is encompassed by the plain meaning of the term.

Accordingly, the Court rejects Defendants' proposal to define "website" as all the webpages associated with a domain, including any of its subdomains, construes "website" and "web-site" as set forth below, and determines that "subsequent website" and "subsequent "web-site" have their plain and ordinary meanings without the need for further construction.

- "website" and "web-site" each means "a group of related HTML documents and any associated files, scripts, and databases that is served up by an HTTP server on the World Wide Web."

### J.     "host servers"

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "host servers"<br>• '875 Patent Claim 17 | host server | indefinite |

### The Parties' Positions

Plaintiff submits: The term "host servers" in Claim 17 is a typographical error of "host server." The singular term "host server" is used elsewhere in the '875 Patent and claims, and the broader term "a host servers" lacks agreement between "a" and "host servers," indicating that "host servers" is properly understood as "host server." Dkt. No. 181 at 30–31.

In addition to the claims themselves, Plaintiff cites the following **extrinsic evidence** to support its position: Vijh Decl. ¶¶ 94–96 (Plaintiff's Ex. D, Dkt. No. 181-5).

Defendants respond: The term "a host servers" may reasonably refer to a single host server or it may refer to multiple host servers and there is no way to discern which is the correct interpretation. Dkt. No. 188 at 36–38.

In addition to the claims themselves, Defendants cite the following **intrinsic evidence** to support their position: '875 Patent col.5 l.66 – col.6 l.10, col.14 ll.45–49.

Plaintiff replies: The use of "host servers" is a "clear grammatical error" and one of ordinary skill in the art would reasonably understand it as "host server." Dkt. No. 189 at 13.

## Analysis

The issue in dispute is whether the meaning of the term "a host servers" is reasonably certain. The Court finds that "a host servers" is a typographic error and should be construed as "a host server."

The Court agrees with Plaintiff that "servers" in "a host servers" represents a typographical error and should properly be interpreted as "server." Claim 17 provides as follows (with emphasis added):

> 17. A computer-implemented method for accessing an information account stored in a central data repository that is accessible via a distributed network and is coupled to ***a host servers*** the information account containing consumer information elements that are changed by the consumer, the method comprising the steps of:
>
> transmitting to ***a host server***, over the distributed electronic network, a first request for access to the information account and consumer authentication information in response to the consumer inputting the consumer authentication information while interacting with a first web-site hosted by a vendor server;
>
> receiving an acknowledgment indicating that ***the host server*** authenticated the consumer based on the consumer authentication information, thereby providing the consumer with access to the information account stored in the central data repository, a first consumer information element of the information account comprising one or more name fields to identify the consumer, a second consumer information element of the information account comprising one or more geographic address fields associated with the consumer;
>
> in response to the acknowledgment, automatically managing subsequent authentications of the consumer with ***the host server*** so that the consumer will not be required to again input the consumer authentication information upon initiating a second request for access to the information account while interacting with a subsequent website that is configured to provide access to the information account upon authentication of the consumer;
>
> in response to the first, second, and subsequent requests for access to the information account stored in the central data repository, retrieving one or more consumer information elements from the information account by filtering data from the information account based on identification of a web-site being accessed by the consumer;
>
> sending the retrieved consumer information elements over the distributed electric network;
>
> parsing the retrieved consumer information elements; and

> auto-populating input fields of a displayed web nale file of the web-site being
> accessed by the consumer with the consumer information elements.

'875 Patent col.29 ll.8–52. It appears that "servers" is a patent-office printing error. Issued Claim

17 corresponds to submitted claim 22 in the claim set submitted to the patent office on July 5,

2005. Then-Pending claim 22 provides as follows (with markings in the original and bold emphasis

added):

> 22. (Currently Amended) A computer-implemented method for accessing an information account stored in a central data repository that is accessible via a distributed network <u>and is coupled to</u> ***a host server***, the information account containing consumer information elements that ~~can be altered~~ <u>are changed</u> by the consumer, the method comprising the steps of:
>> transmitting to ***a host server***, over the distributed electronic network, a first request for access to the information account and consumer authentication information in response to the consumer inputting the consumer authentication information while interacting with a first web-site hosted by a vendor server;
>> receiving an acknowledgment indicating that ***the host server*** authenticated the consumer based on the consumer authentication information. thereby providing the consumer with access to the information account <u>stored in the central data repository, a first consumer information element of the information account comprising one or more name fields to identify the consumer, a. second consumer information element of the information account comprising one or more geographic address fields associated with the consumer;</u> [[and]]
>> in response to the acknowledgment, automatically managing subsequent authentications of the consumer <u>with ***the host server***</u> so that the consumer will not be required to again input the consumer authentication information upon initiating a second request for access to the information account while interacting with a subsequent web-site that is configured to provide access to the information account upon authentication of the consumer;
>> <u>in response to the first, second, and subsequent requests for access to the information account stored in the central data repository, retrieving one or more consumer information elements from the information account by filtering data from the information account based on identification of a web-site being accessed by the consumer;</u>
>>> <u>sending the retrieved consumer information elements over the distributed electronic network;</u>
>>> <u>parsing the retrieved consumer information elements; and</u>
>>> <u>auto-populating input fields of a displayed web page file of the web-site being accessed by the consumer with the consumer information elements.</u>

'875 Patent File Wrapper July 5, 2005 Response at 7, Dkt. No. 181-7 at 8. Here, the preamble language is "a host server." There is no evidence of record that the claims were subsequently amended to change "a host server" to "a host servers" before the '875 Patent issued on March 21, 2006. Indeed, on examination of the publicly available file wrapper for the '875 Patent,[26] the Court takes notice that there is no record of a claim amendment between July 5, 2005 and the issue date. As such, the Court declines to hold Claim 17 invalid for including "a host servers" in the preamble.

The Court also understands that "a host server" in the body of the claim forms the antecedent basis of the "the host server" subsequently recited in the claim. That is, the "a host server" in the preamble is duplicative of the "a host server" in the body of the claim and thus does not form a separate limitation. *See TomTom, Inc. v. Adolph*, 790 F.3d 1315, 1322–24 (Fed. Cir. 2015) (stating that portions of a limiting preamble are not limiting when "merely duplicative of the limitations in the body of the claim" (quotation marks omitted)). Thus, the presence of "a host server" in the preamble does not breathe death to the claim through the indefiniteness advocated by Defendants at the hearing.

Accordingly, the Court determines that Defendants have not proven Claim 17 of the '875 Patent is invalid as indefinite for the recitation of "host servers" in the preamble and construes "a host servers" from the preamble as follows:

- "a host servers" means "a host server."

---

[26] The file wrapper for the '875 Patent is available to the public through the U.S. Patent and Trademark Office's Public Patent Application Information Retrieval system at https://portal.uspto.gov/pair/PublicPair.

### K. "selected consumer information elements"

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "selected consumer information elements"<br>• '581 Patent Claims 1, 24, 36 | plain and ordinary meaning | consumer information elements that correspond with the input fields that are to be populated and displayed |

### The Parties' Positions

Plaintiff submits: The '581 Patent teaches that information accounts may include data aggregates which in turn include elements that do not necessarily "correspond with the input fields that are to be populated and displayed." Defendants' proposed construction would improperly exclude these information elements. Dkt. No. 181 at 31–33.

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '581 Patent fig.3, col.4 ll.30–47, col.11 l.63 – col.12 l.12.

Defendants respond: As expressed in the claims, the information elements are selected from the information account and then used to auto-populate at least one input field. Thus, the selected elements correspond with the input field(s) that are auto-populated and displayed. Dkt. No. 188 at 38–40.

In addition to the claims themselves, Defendants cite the following **intrinsic evidence** to support their position: '581 Patent, at [57], col.2 ll.13–19, col.2 ll.47–49; '875 Patent col.26 ll.26–44.

Plaintiff replies: Defendants' proposed construction improperly imports limitations from the embodiments. Dkt. No. 189 at 12.

### Analysis

The issue in dispute is whether the "selected consumer information elements" necessarily "correspond with the input fields that are to be populated and displayed." To the extent this requires

59

more than that the selected elements are auto-populated into at least one input field of a web page file, as otherwise expressed in the claims, the selected elements do not necessarily "correspond with the input fields that are to be populated and displayed."

The Court rejects Defendants' proposed construction because it fails to clarify claim scope and instead threatens to improperly limit the claims. The claims at issue here all include a limitation by which the selected consumer information elements are auto-populated into at least one input field of a web page file. Claims 1 and 24 both recite "autopopulating the selected consumer information elements into at least one input field of a web page file." '581 Patent col.18 ll.44–45, col.21 ll.9–10. Claim 36 recites "~~autopopulating~~ autopopulate the selected information elements into at least one input field of a web pa[g]e file." *Id*. at col.23 ll.18–19. Thus, the Court understands that under a plain reading of the claim language the selected elements are auto-populated into the input fields. This does not need to be clarified by stating that the selected elements "correspond" with the input fields. Further, "correspond" threatens to improperly limit the claims by, for example, suggesting a negative limitation that would exclude processes that include selected information elements for use other than auto-populating, which are not properly excluded from the scope of the open-ended claims at issue here. Finally, and as set forth above in the section on Agreed Constructions, the parties agree that the "autopopulating" and "autopopulate" limitations include a "displayed" limitation, so the Court perceives no dispute to resolve by including a "displayed" limitation in the construction of "selected consumer information elements."

Accordingly, the Court rejects Defendants' proposed "that correspond with the input fields that are to be populated and displayed" limitation and determines that "selected consumer information elements" has its plain and ordinary meaning without the need for further construction.

### L. "access to the information account"

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- | --- |
| "access to the information account"<br><br>• '875 Patent Claims 1, 17, 27[27] | plain and ordinary meaning | ability to instruct the DBMS to retrieve information from the information account, based on having been authenticated |

#### The Parties' Positions

Defendants submit: As Plaintiff's expert agrees, "access to the information account" requires the "ability to retrieve information from the account, based on having been authenticated," and the '875 Patent explains that this access is necessarily through the database management system. Dkt. No. 188 at 40–41.

In addition to the claims themselves, Defendants cite the following intrinsic and extrinsic evidence to support their position: **Intrinsic evidence**: '581 Patent figs.5–7; '875 Patent fig.1, col.6 ll.38–40, col.7 l.66, col.8 ll.31–33, col.8 ll.54–56, col.15 ll.7–10, col.17 l.65 – col.18 l.3.

**Extrinsic evidence**: Vijh Decl. ¶¶ 84, 86 (Plaintiff's Ex. D, Dkt. No. 181-5).

Plaintiff replies: Defendants' proposed construction improperly imports limitations from the embodiments. Dkt. No. 189 at 12.

#### Analysis

The issue in dispute appears to be whether the access is necessarily through the database management system. It is.

Claim 27 of the '875 Patent expressly provides that access to the information account is through the database management system:

---

[27] The parties did not identify Claims 1 and 17 in their Joint Claim Construction Chart, Dkt. No. 192-1 at 6, but explained at the hearing that the claims should have been identified for this term.

> *in response to* the first, second, and subsequent ***requests for access to the information account*** stored in the central data repository, ***retrieving*** one or more consumer information elements from the information account with the host server by filtering data from the information account ***with the database management system*** based on an identification of a web-site being accessed be the consumer.

'875 Patent col.31 ll.28–35 (emphasis added). This access to the account is expressly conditioned on authentication:

> in response to the request [for access to the information account], authenticating the consumer with the host server based on the consumer authentication information, thereby providing the consumer with access to the information account stored in the central data repository.

*Id.* at col.31 ll.14–18. That is, the Court does not see that Defendants' proposed construction "improperly imports limitations from the embodiments." Given that Plaintiff did not identify what limitations are improperly imported, or even substantially engage on this term, the Court adopts Defendants' proposed construction with the understanding the "ability to instruct the database management system" includes both direct and indirect instruction of the database management system—it does not exclude instructions effected through an intermediary.

Accordingly, the Court construes "access to the information account" as follows:

- "access to the information account" means "ability to instruct the database management system to retrieve information from the information account, based on having been authenticated."

**M.** **"information account comprising a plurality of consumer information elements associated with a consumer and being subject to the consumer's control and management" and "information account comprising a plurality of consumer information elements associated with a consumer and subject to the consumer's control and management"**

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "information account comprising a plurality of consumer information elements associated with a consumer and being subject to the consumer's control and management"<br><br>• '581 Patent Claims 1, 24<br>• '806 Patent Claims 1, 11, 19 | plain and ordinary meaning | a comprehensive information profile that: (a) contains consumer information elements associated with a consumer; and (b) for which the consumer controls the types, amounts, and recipients of information stored in the account |
| "information account comprising a plurality of consumer information elements associated with a consumer and subject to the consumer's control and management"<br><br>• '581 Patent Claim 58 | | |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

**The Parties' Positions**

Plaintiff submits: The plain meaning of the claim language is accessible without construction. Further, Defendants' proposed construction is improper as it replaces phrases with synonyms that do not clarify scope (changing "information account" to "comprehensive information profile"), replaces phrases with narrower language (changing "comprising a plurality of" to "contains"), and injects ambiguity (changing "subject to the consumer's control and management" to "for which

the consumer controls the types, amounts, and recipients of information stored in the account"). Dkt. No. 181 at 34–35.

Defendants respond: The term "information account" is expressly defined in the Asserted Patents to refer to a "comprehensive information profile." The term "comprising a plurality of" is more clearly expressed as "contains," but they mean the same thing. And "consumer controls the types, amounts, and recipients of information stored in the account" clarifies the type of the recited "control and management" consistent with the description of the invention. Dkt. No. 188 at 42–44.

In addition to the claims themselves, Defendants cite the following **intrinsic evidence** to support their position: '581 Patent col.3 ll.44–46, col.3 ll.48–53, col.3 ll.58–63, col.6 ll.51–54.

Plaintiff replies: Defendants' proposed construction improperly imports limitations from the embodiments. Dkt. No. 189 at 12.

### <u>Analysis</u>

There are three issues raised by the dispute. First, whether "information account" should be construed as "comprehensive information profile." It should. Second, whether "comprising a plurality of" should be rewritten as "contains." It should not. Third, whether "subject to the consumer's control and management" should be limited to "the consumer controls the types, amounts, and recipients of information stored in the account." It should not.

To begin, the Asserted Patents equate "information account" with "comprehensive information profile":

> In one or more embodiments, a system and method are provided for enabling consumers to store and maintain ***a comprehensive information profile (hereinafter "information account")*** in a centralized data repository that is accessible over a distributed electronic network, such as the Internet.

64

'875 Patent col.4 ll.19–24; *see also*, '581 Patent col.3 ll.43–48 (same). As such, the Court adopts the patentee's lexicography.

The Court declines to rewrite "comprising a plurality of" to "contains." To the extent these terms mean the same thing, "contains" does not clarify the meaning. It is also not clear to the Court that the terms mean the same thing. The term "contains" may suggest a holding or restraining aspect that is not necessarily present in "comprising." And the term "contains" completely abrogates the "plurality of" limitation. Simply, Defendants' proposed construction does not clarify but rather threatens to obfuscate or change claim scope. The meaning of "comprising a plurality of" is plain and readily accessible—there is no legitimate dispute over its meaning.

Finally, the Court rejects that "subject to the consumer's control and management" of the disputed terms is necessarily limited to "the consumer controls the types, amounts, and recipients of information stored in the account." Defendants' proposal does not simply "clarif[y] the term in a manner consistent with the intrinsic record." Dkt. No. 188 at 44. Rather, it supplants the issued claim language with features of described embodiments of the invention and thereby improperly narrows the claims.

Accordingly, the Court construes the terms as follows:

- "information account comprising a plurality of consumer information elements associated with a consumer and being subject to the consumer's control and management" means "comprehensive information profile comprising a plurality of consumer information elements associated with a consumer and being subject to the consumer's control and management"; and

- "information account comprising a plurality of consumer information elements associated with a consumer and subject to the consumer's control and

management" means "comprehensive information profile comprising a plurality of consumer information elements associated with a consumer and subject to the consumer's control and management."

**N.** **"name field," "geographic address field," "information account," "personal information account," "information element," and "authentication information"**

| Disputed Term | Plaintiff's Proposed Construction | Tailored Brands' Proposed Construction |
|---|---|---|
| "name field"<br>• '875 Patent Claims 1, 17, 27 | plain and ordinary meaning | term is not entitled to any patentable weight under the printed matter doctrine |
| "geographic address field"<br>• '875 Patent Claims 1, 17, 27 | plain and ordinary meaning | term is not entitled to any patentable weight under the printed matter doctrine |
| "information account"<br>• '581 Patent Claims 1, 24, 36, 58 | plain and ordinary meaning | term is not entitled to any patentable weight under the printed matter doctrine |
| "personal information account"<br>• '581 Patent Claim 82 | plain and ordinary meaning | term is not entitled to any patentable weight under the printed matter doctrine |
| "information element"<br>• '581 Patent Claims 1, 24, 36, 58, 82<br>• '806 Patent Claims 1, 11, 27 | plain and ordinary meaning | term is not entitled to any patentable weight under the printed matter doctrine |
| "authentication information"<br>• '581 Patent Claims 1, 24, 41, 59, 83 | plain and ordinary meaning | term is not entitled to any patentable weight under the printed matter doctrine |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

**The Parties' Positions**

Plaintiff submits: These terms do not claim the content of information and therefore are not directed to printed matter and are entitled to patentable weight. Further, even if the printed-matter doctrine applied to these terms, they are entitled to patentable weight because they are functionally connected to the substrate ("i.e. system comprising data repository, DBMS, servers, application, and browser"). Dkt. No. 181 at 24–26.

**Analysis**

At the hearing, the parties agreed that these terms should be given their plain and ordinary meanings without further construction, except for "information account" the meaning of which is the subject of a separate dispute here submitted to the Court. Accordingly, the Court does not perceive a separate dispute and therefore does not construe these terms apart from constructions of other terms in this Order.

## V.    CONCLUSION

The Court adopts the constructions above for the disputed and agreed terms of the Asserted Patents. Furthermore, the parties should ensure that all testimony that relates to the terms addressed in this Order is constrained by the Court's reasoning. However, in the presence of the jury, the parties should not expressly or implicitly refer to each other's claim construction positions and should not expressly refer to any portion of this Order that is not an actual construction adopted by the Court. The references to the claim construction process should be limited to informing the jury of the constructions adopted by the Court.

**SIGNED this 5th day of September, 2019.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE