# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| CXT SYSTEMS, INC., <br> *Plaintiff,* <br> v. <br> ACADEMY, LTD., D/B/A ACADEMY SPORTS + OUTDOORS, <br> *Defendant.* | § § § § § § § § § | Case No. 2:18-CV-00171-RWS-RSP <br> LEAD CASE |
| CXT SYSTEMS, INC., <br> *Plaintiff,* <br> v. <br> J. C. PENNEY CORPORATION, INC., <br> *Defendant.* | § § § § § § § § § | Case No. 2:18-CV-00233-RWS-RSP <br> CONSOLIDATED CASE |

## MEMORANDUM ORDER

Before the Court is the Motion to Exclude the Expert Testimony of CXT Systems, Inc.'s

Damages Expert David A. Haas (the "Motion"), filed by Defendant J. C. Penney Company, Inc.

("JCP"). (**Dkt. No. 283**). In the Motion, JCP argues that the Court should strike Mr. Haas'

testimony in its entirety because it depends on unreliable sources of information and methods to

calculate the proposed royalty rate. Having considered the briefing on the Motion and Mr. Haas'

report, the Court **DENIES** the Motion.

## I.    BACKGROUND

CXT sued JCP, among others, for infringement of U.S. Patent Nos. 7,016,875, 7,257,581,

and 8,260,806 (collectively, the "Asserted Patents"). (*See, e.g.*, Dkt. No. 28). The patented

technology generally covers systems and methods relating to optimizing online shopping

experience such as auto-populate features (which fill in necessary check-out fields with stored

customer information for registered customers) and customer authentication features that, among

other things, eliminate the need for multiple sign-ins. (*See id*.). CXT accuses JCP of operating e-commerce infrastructures that employ methods covered by the Asserted Patents to "improve the shopping experience of their buyers." (*Id*. at 7). These benefits generally relate to more efficient consumer check-out processes resulting from use of the systems employed by the accused e-commerce infrastructures.

CXT retained Mr. Haas to quantify damages that would provide appropriate compensation to CXT in the event infringement was found. He did so and summarized his findings in his report. (Dkt. No. 283-1).[1] While his report is initially applicable to all the defendants, Appendix A is specifically geared towards analyzing the situation between CXT and JCP. (*See id*. at 30–59).

In his report, Mr. Haas calculated the damages period for JCP to be from June 1, 2012, to August 31, 2019.[2] (*Id*. at 34–35). Further, he found that a hypothetical negotiation would have taken place in April 2012. (*Id*.). Using those dates combined with his analysis, Mr. Haas concluded that JCP would have agreed to pay the patent owner[3] a lump sum reasonable royalty of $37.2 million[4] based on a 0.5% royalty rate of all JCP's e-commerce revenues. (*Id*. at 58).

Mr. Haas calculated this royalty rate by first looking at JCP as a whole. He described JCP as "one of the United States' largest apparel and home retailers, combining 850 brick-and-mortar stores across the nation with 'a powerful e-commerce site, jcp.com.' JCP's strategy includes an 'omnichannel retail' approach" which is described on JCP's website as "*making the shopping experience easy and seamless across all channels and devices . . . .*" (*Id*. at 32).

---

[1] Citations within this Order usually refer to the page number of the original document. For Mr. Haas' report, however, citations will be to the CM-ECF page number as it contains multiple documents in one.
[2] While Mr. Haas states that the damages period would be ongoing, he used the August date as that is the most recent date for which he has sales data from any of the defendants.
[3] CXT did not own the Asserted Patents in April 2012.
[4] Mr. Haas, at the bequest of his client, also prepared an alternative royalty calculation that totaled $35.8 million, where he assumed that JCP's sales through a PayPal payment portal were not subject to a royalty.

Mr. Haas then looked at JCP's revenue, gross profit, and operating profit by fiscal year since 2012. Mr. Haas also looked at JCP's e-commerce revenue as CXT alleges that the JCP website and backend computer systems infringe the Asserted Patents; although, he did not have information relating specifically to the profitability of the e-commerce business. (*Id*. at 33–34). Further, Mr. Haas looked at JCP's main and assistive website views. The assistive view is handicap-accessible and can be reached by clicking the accessible view option on the main website.

He then analyzed all fifteen of the *Georgia-Pacific* factors, paying particular attention to Factor 11—the extent to which the infringer has made use of the invention; and any evidence probative of the value of that use. *See Georgia-Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970). During his analysis of that factor, Mr. Haas explained how he used the two different websites to estimate the value added by the allegedly-infringing features.

Mr. Haas explained that the assistive view was fully launched in June 2018 and besides the additional accessibility features, appeared to work the same as the main website. In March 2019, however, JCP discontinued the alleged practice of certain patented elements on the assistive website. "JCP 'changed the feature that had previously persisted the authenticated state of a customer that had logged into www.jcpenney.com first, and then clicked on the option for the accessible view of www.jcpenney.com.'" (*Id*. at 40 (quoting JCP's Objections and Responses to Plaintiff's First Set of Individual Interrogatories (Nos. 11-20), September 23, 2019, pg. 9.))

Mr. Haas then analyzed and compared data for JCP's assistive website both before and after this action and, using the main JCP website as a benchmark, identified the extent to which this removal of certain authentication features appeared to have reduced conversion rates on the assistive website. This data led him to conclude that the royalty rate should be 0.5% of JCP's U.S.

e-commerce sales over the Damages Period since approximately 0.5% of all site visitors would be potentially dissuaded from making a purchase by the disablement of the authentication feature alone. He then applied that rate to JCP's e-commerce sales during the Damages Period and discounted those values back to the hypothetical negotiation date in April 2012 using JCP's weighted average cost of capital (WACC) as a discount rate, leading to a present value of $37.2 million as of April 2012. (*Id.* at 57–58).

Mr. Haas discussed how he used a comparable agreement as a check on his prior analysis during his analysis of Georgia-Pacific Factor 12—the portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions. *Id.* (*See id.* at 50–52). He found a service agreement between co-defendant Fossil Group, Inc. and third-party PayPal where Fossil paid a fixed fee of $0.15 per transaction and an additional fee of between 1.8% and 2.8% of online transaction revenues to PayPal for the use of its checkout services for e-commerce sites.

While Mr. Haas recognized that the Fossil-PayPal agreement was not a patent license and dissimilar in some ways to the rights that would be conveyed in a hypothetical license, he found that the agreement, like the Asserted Patents, relates to checkout functionality on an e-commerce website. On its website, PayPal markets three primary benefits of its technology: "secure", "fast", and "easy." Mr. Haas specifically found the "fast" benefit as directly comparable to the auto population and authentication technology of the Asserted Patents. Finding the three benefits cited by PayPal to be of equal value, he concluded that the parties to the hypothetical negotiation would have considered 0.6% of the transaction price —1/3 of the 1.8% fee in the service agreement–as a useful data point to measure the overall value of auto population. (*Id.* at 57).

JCP filed the Motion, objecting that certain parts of Mr. Haas' report are so unreliable that the entire report should be deemed inadmissible for trial.

## II.     LEGAL STANDARD

Federal Rule of Evidence 702 provides that a qualified expert may testify if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In accordance with Rule 702, the Supreme Court has held that trial courts must act as gatekeepers to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 589 (1993); *see also Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999). "This gate-keeping obligation applies to all types of expert testimony, not just scientific testimony." *Pipitone v. Biomatrix, Inc.,* 288 F.3d 239, 244 (5th Cir. 2002) (citing *Kumho,* 526 U.S. at 147).

"The burden of proving damages falls on the patentee." *Lucent Techs., Inc. v. Gateway. Inc.,* 580 F.3d 1301, 1324 (Fed. Cir. 2009) (citations omitted). To be admissible under Rule 702, "expert testimony opining on a reasonable royalty rate must 'carefully tie proof of damages to the claimed invention's footprint in the market place.'" *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011) (quoting *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010)). However, "[d]etermining a fair and reasonable royalty is often … a difficult judicial chore, seeming often to involve more the talents of a conjurer than those of a judge." *ResQNet.com*, 594 F. 3d at 869 (ellipsis in original) (citation omitted). So long as an expert's methodology is sound and his opinions satisfy the requirements of Rule 702, underlying factual disputes and how much weight to accord the expert's opinion are questions for the jury. *See e.g.*, *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392–93 (Fed. Cir. 2003).

When evaluating *Daubert* challenges, courts must focus "solely on principles and methodology, not on the conclusions that they generate." *Daubert,* 509 U.S. at 595. As the Court has emphasized, the *Daubert* framework is "a flexible one." *Id*. at 594. Further, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id*. at 596. Accordingly, the decision to allow or exclude experts from testifying under *Daubert* is committed to the sound discretion of the district court. *See St. Martin v. Mobil Expl. & Producing U.S. Inc.,* 224 F.3d 402, 405 (5th Cir. 2000) (citation omitted).

## III. ANALYSIS

JCP has three major complaints regarding Mr. Haas' report. First, JCP argues that the way Mr. Haas extrapolated the decline in sales on JCP's assistive site to JCP's main website following the disabling of the single sign-on function was unreliable. (Dkt. No. 283 at 4). Second, JCP argues that Mr. Haas relied on the Fossil-PayPal agreement too much in his reasonable royalty calculation, making the entire opinion flawed. (*Id*. at 7). Third, JCP argues that Mr. Haas' opinion is flawed since he failed to give enough weight to other license agreements. (*Id*. at 11). The Court, finding none of JCP's arguments persuasive, holds that JCP has not carried its burden of showing that the Haas methodology is not sufficiently unreliable.

### a. Extrapolation of Assistive Website to Main Website

JCP argues that Mr. Haas' extrapolation was unreliable for four reasons. First, Mr. Haas attributed the entire decrease in JCP's assistive view sales to JCP's elimination of the single sign-on function. Mr. Haas did this because he believed that was the only change made to the assistive website within the relevant time period. JCP complains that he did not sufficiently investigate whether there were other changes. Yet, JCP does not cite a single other change to the assistive

6

website. Therefore, it has not met its burden of showing that Mr. Haas' methodology was not sound. Instead, it appears to be a question of how much weight to accord the expert's opinion, which is a question for the jury. *See Micro Chem.*, 317 F.3d at 1392–93.

Second, JCP argues that Mr. Haas looked at a monthly metric when he should have looked at a daily average. Mr. Haas explained his decision was due to the daily statistics being too granular to provide meaningful input. As this is an arguable reason to choose a monthly average, the Court finds that cross-examination is the appropriate remedy.

Next, JCP argues that Mr. Haas' use of the assistive view conversion rate to predict a similar change in the main JCP website fails to demonstrate a causal link between the two. JCP argues that the two websites have "a vastly different consumer demographic." Further, JCP argues that the main website does not rely on third-party code that "could" affect conversion rates. (Dkt. No. 283 at 6). With this argument, JCP seems to simply be disagreeing with Mr. Haas' conclusion. Further, nothing in the record indicates how the third-party code in the assistive website affects performance or would change Mr. Haas' conclusion.

Lastly, JCP argues that the assistive view receives far less traffic than the main website and therefore, is unreliable in predicting the conversion rate for the main site users. Yet, the assistive website received tens of thousands of "sessions" per month during the relevant time period. (*See* Dkt. No. 283-1 at 41 fn.21). JCP does not explain why this would not be enough to be statistically significant. Further, Mr. Haas considered this as he explained that "[w]hile the assistive website is considerably smaller in terms of total revenue than the main website – and thus may be more prone to fluctuations – I believe this natural experiment to provide an indication of the potential impact on JCP's overall e-commerce business . . . ." (*Id.* at 48).

The Court finds that the points raised by JCP do not show that Mr. Haas' opinions are not sufficiently reliable. Instead, they go towards the weight that should be given, which is an inappropriate consideration on a *Daubert* challenge.

### b. Fossil-PayPal Agreement

JCP's next objection is that Mr. Haas' calculation of a reasonable royalty using the Fossil-PayPal agreement is flawed and should be excluded. (Dkt. No. 283 at 7). First, JCP argues that Mr. Haas improperly relied on an agreement that JCP is not a party to when other agreements exist where JCP is a party. As an initial matter, CXT persuasively argues that Mr. Haas did not base JCP's royalty rate on the one that Fossil negotiated with PayPal.[5] Instead, he used the agreement to confirm that his royalty calculation, which was based on his analysis of the assistive view website as discussed in the previous section, made sense when compared to other agreements. Further, Mr. Haas explained why he choose this agreement over others, as explained in further detail below. For example, he found that many of the agreements were made in view of litigation, which would involve considerations not present in a hypothetical negotiation. Finally, JCP's own expert agreed that the JCP-PayPal agreement cited by JCP in its Motion is similar to the Fossil-PayPal agreement and should be analyzed in virtually the same manner. (*See* Dkt. No. 283-2 at 81).

Second, JCP argues that the Fossil-PayPal agreement is a services agreement, not the type of intellectual property licensing agreement envisioned by the "hypothetical negotiation" process. Yet, the Federal Circuit, applying Fifth Circuit law, has previously allowed consideration of service agreements when the agreement is closely comparable, and the expert expressly addresses the differences between those negotiations and any hypothetical negotiations. *See SSL Servs., LLC*

---

[5] As an indication of this, Mr. Haas used 0.5% as his royalty rate, even though the rate he determined using the Fossil-PayPal agreement was 0.6%.

*v. Citrix Sys., Inc.*, 769 F.3d 1073, 1093 (Fed. Cir. 2014). Here, while other agreements exist, Mr. Haas discussed why he believed the Fossil-PayPal was the most suitable agreement. He found that the agreement, like the Asserted Patents, relates to checkout functionality on an e-commerce website. Further, he "expressly addressed the differences between the license negotiations and any hypothetical negotiations, thereby clarifying for the jury where such differences might exist and the limited value of such evidence." *Id.* (*See* Dkt. No. 283-1 at 51). Under these circumstances, it is not improper for an expert to rely on a services agreement.

Third, JCP argues that Mr. Haas improperly relied on PayPal's website to arrive at his royalty rate. The website lists the three primary benefits of its technology as "secure", "fast", and "easy." Mr. Haas explained that he found the "fast" benefit directly comparable to the auto population and authentication technology of the Asserted Patents. The Federal Circuit has allowed an expert to determine a royalty rate based on comparable features in the marketplace. *See Summit 6, LLC v. Samsung Elecs. Co.,* 802 F.3d 1283, 1296 (Fed. Cir. 2015).

Thus, JCP has not sufficiently proven that Mr. Haas' analysis was improper or untethered to the facts of this case. Instead, its objections in this section go to the weight that should be given to Mr. Haas' analysis. If JCP disagrees with the weight Mr. Haas assigned to the Fossil-PayPal agreement, it can cross-examine him at trial. *See Daubert*, U.S. at 596 ("[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

### c. Other License Agreements

JCP's last objection is that Mr. "Haas mentions but otherwise ignores CXT's licensing agreements of the actual Patents-in-Suit because they were made in the course of litigation." (Dkt. No. 283 at 11). Yet, Mr. Haas analyzed the other agreements in his discussion of *Georgia-Pacific*

1 and 12, concluding that the relevance of these agreements should be discounted because the compensation was likely impacted by litigation costs and risks that would not have been present in the hypothetical negotiation. (*See, e.g.*, Dkt. No. 283-1 at 18–19). Further, the Federal Circuit has expressed similar concerns. *LaserDynamics*, *Inc. v. Quanta Comput.*, *Inc.*, 694 F.3d 51, 77 (Fed. Cir. 2012).

Instead of ignoring these agreements, as JCP argues, Mr. Haas evaluated the agreements and ultimately concluded the Fossil-PayPal Agreement was the most comparable. While JCP may disagree, "[d]etermining a fair and reasonable royalty is often … a difficult judicial chore, seeming often to involve more the talents of a conjurer than those of a judge." *ResQNet.com*, 594 F. 3d at 869 (ellipsis in original) (citation omitted). So long as an expert's methodology is sound and his opinions satisfy the requirements of Rule 702, underlying factual disputes and how much weight to accord the expert's opinion are questions for the jury. *Micro Chem.*, 317 F.3d at 1392–93.

## IV.    CONCLUSION

For the reasons stated herein, the Court **DENIES** the Motion to Exclude the Expert Testimony of CXT Systems, Inc.'s Damages Expert David A. Haas.

**SIGNED this 28th day of January, 2020.**

_____
ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE